*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2015 UT 53**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH TRANSIT AUTHORITY, a Utah public transit district,
*Appellee,*

*v.*

GREYHOUND LINES, INC., a Delaware corporation,
*Appellant.*

No. 20131076
Filed July 10, 2015

Third District, Salt Lake
The Honorable Randall N. Skanchy
No. 090915370

Attorneys:

Scott M. Petersen, David N. Kelley, Salt Lake City, for appellee

Karra J. Porter, Sarah E. Spencer, Salt Lake City, for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE
PARRISH, and JUSTICE HIMONAS joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## Introduction

¶1 We have long strictly construed contractual provisions that call for one party to indemnify another, requiring that such provisions clearly and unequivocally manifest the intent to do so. In this case, we are asked to consider whether we should also strictly construe a contractual provision requiring one party to procure insurance for the benefit of another.

¶2 We conclude that while an agreement to indemnify is similar in some respects to an agreement to procure insurance, the policy we have identified as supporting strict construction of the former does not apply with equal force to the latter; and we decline,

for reasons that we will describe, to require that an agreement to procure insurance be strictly construed.

¶3 This case involves a lease (Lease Agreement) between Greyhound Lines, Inc. (Greyhound), the lessee, and Utah Transit Authority (UTA), the lessor, for a section of UTA's intermodal transportation facility (Intermodal Hub). The dispute focuses on whether the insurance procurement provision of the Lease Agreement (section 10), which required Greyhound to purchase commercial general liability insurance covering UTA, required that this insurance cover UTA's negligent acts. Greyhound argues that under our caselaw a rule of strict construction applies to an agreement to provide insurance for another's benefit. But UTA argues that our caselaw does not require that we strictly construe such insurance procurement provisions. UTA also claims that under traditional contractual interpretation principles, section 10 required Greyhound to purchase insurance to cover UTA's negligent acts. Greyhound failed to purchase the required insurance, and thus UTA asserts that Greyhound breached the contract.

¶4 The dispute between UTA and Greyhound arises in the context of a slip-and-fall personal injury claim that resulted from UTA's negligence. A Greyhound passenger, Alma Bradley, was on an interstate Greyhound bus trip when she stopped for a layover at the Intermodal Hub. During her layover, she walked outside the building and fell from a concrete pedestrian ramp. She sustained serious injuries. UTA admitted negligence in not installing a handrail on the pedestrian ramp. The injured passenger subsequently submitted a claim to UTA to recover for her injuries. UTA ultimately settled the claim for $50,000 and an agreement to satisfy any resulting Medicare liens. UTA requested that Greyhound reimburse it for the cost of the claim under section 10 of the Lease Agreement. Greyhound again refused and this litigation resulted.

¶5 The district court issued a memorandum decision and a subsequent order on the parties' cross motions for summary judgment. In this order, the district court held (1) that the insurance procurement provision of the Lease Agreement is not subject to strict construction under Utah law; (2) that UTA was required under the Lease Agreement to secure insurance that covered UTA's negligent acts; (3) that Ms. Bradley's personal injury claim triggered Greyhound's duty to provide insurance under the Lease Agreement; and (4) that Greyhound breached the contract by not securing insurance. The court entered judgment against Greyhound, awarding UTA damages for the breach. These damages included

recovery for all of Ms. Bradley's settlement and UTA's attorney fees and costs.

¶6   Greyhound has appealed the district court's decision on summary judgment and now asks us to review three issues: (1) whether under Utah law, an agreement to procure insurance for the benefit of another must be strictly construed; (2) whether the district court erred when it concluded that Ms. Bradley's claim triggered Greyhound's duty to procure insurance; and (3) whether the district court abused its discretion in awarding UTA's attorney fees. We affirm the district court's decision on all issues. We clarify that under Utah law, an agreement to procure insurance for the benefit of another is not subject to strict construction. Also, we conclude that under the traditional rules of contractual interpretation, Greyhound's duty to provide insurance to UTA was triggered, and this duty included the duty to provide insurance that covered UTA's negligent acts. As a result, we uphold the district court's finding that Greyhound breached the Lease Agreement. Finally, we uphold the district court's attorney fee award because it is reasonable and based on sufficient evidence in the record.

## Background

¶7   Greyhound and UTA entered into a Lease Agreement on August 2, 2005.[1] Greyhound leased a portion of UTA's Intermodal Hub, located in downtown Salt Lake City, as a passenger bus terminal for its interstate bus service. This case involves the interpretation of the Lease Agreement's indemnity and insurance procurement provisions as they relate to a slip-and-fall accident that occurred on the leased premises. UTA has admitted that the slip-and-fall accident resulted from its own negligence.

¶8   On March 18, 2008, Ms. Alma Bradley was on a Greyhound bus trip between California and Idaho when she stopped for a layover at the Intermodal Hub. During her layover, Ms. Bradley walked outside the building, in the common area covered by the Lease Agreement, and fell from a concrete pedestrian ramp. She sustained serious injuries. UTA has admitted that it was negligent in not installing a handrail on the pedestrian ramp. Ms. Bradley subsequently submitted a claim to UTA to recover for her injuries.

---

[1] We note that, while Greyhound was an original party to the lease, UTA took an assignment of the rights and obligations of the Lease Agreement from the prior facility owner, Salt Lake City, on March 12, 2007.

UTA requested that Greyhound "defend, indemnify and hold UTA harmless" from Ms. Bradley's claim. Greyhound refused. UTA ultimately settled the claim for $50,000 and an agreement to satisfy any of Ms. Bradley's resulting Medicare liens. After the settlement, UTA requested that Greyhound reimburse it for the cost of Ms. Bradley's claim. UTA sought reimbursement under section 10 of the Lease Agreement, the insurance procurement provision. Greyhound again refused and UTA filed a complaint in September 2009, claiming breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty.

¶9 The parties' dispute focuses on the proper interpretation of the Lease Agreement's indemnity and insurance procurement provisions. Greyhound argues that the insurance procurement provision did not require it to purchase insurance to cover UTA for liability arising from its own negligent acts (or provide such coverage through self-insurance); and therefore, it did not breach the contract by failing to purchase insurance from a third party or failing to self-insure. Greyhound argues that it did not have a duty to provide insurance for UTA's negligence, because the insurance procurement provision did not clearly and unequivocally state that the insurance Greyhound was to provide necessarily covered UTA's negligent acts. Greyhound argues that our caselaw, which requires strict construction of indemnity provisions, should apply with equal force to insurance procurement provisions. Further, Greyhound claims that even if we decline to apply strict construction and instead apply traditional rules of contractual interpretation, it still did not have a duty under the Lease Agreement to provide insurance for UTA's negligence. Greyhound asserts that reading the insurance procurement provision to require that the insurance cover UTA's negligent acts renders the indemnity provision, in which UTA indemnifies Greyhound for UTA's negligent acts, superfluous. Greyhound also argues that Ms. Bradley's injury did not "arise from [Greyhound's] use, occupancy, maintenance, and operations under [the] Lease," so the insurance provision was not triggered and thus Greyhound had no duty to insure UTA for the incident.

¶10 UTA argues that the "clear and unequivocal" interpretive standard applies only to indemnity provisions, not to insurance procurement provisions, and that Greyhound breached the contract by not purchasing third-party liability insurance covering UTA's negligence, or self-insuring for the same. UTA also argues that the insurance procurement and indemnity provisions can be clearly harmonized even if the insurance provision is read to require coverage for its negligent acts.

¶11 The insurance provision in section 10(h) of the Lease Agreement provides,

> [Greyhound], subject to the self-insurance provisions above, at its own costs and expense, *shall secure and maintain* during the term of this Lease, including all renewal terms, the following insurance coverage:
>
> > (1) Third Party Liability
> >
> > > *Commercial general liability insurance with [UTA] named as an additional insured*, in the minimum amount of $1,000,000 per occurrence with a $5,000,000 general aggregate. The policy shall protect [UTA], [Greyhound], and any subcontractor to [Greyhound] from liabilities and claims for damages for personal injury, bodily injury, including accidental death, and from claims for property damage that may arise from [Greyhound's] use, occupancy, maintenance, and operations under this Lease, whether performed by [Greyhound] itself, any subcontractor, or anyone directly or indirectly employed by either of them. (Emphasis added).

Greyhound failed to obtain commercial general liability insurance and denied UTA's request that Greyhound self-insure for the claim.[2]

---

[2] We note that under section 10(a) of the Lease Agreement,

> [f]or any and all types of insurance required in this Lease, [Greyhound] may satisfy its requirement through a lawfully established self-insurance program. Any such self-insurance program shall be subject to [UTA's] right to verify the adequacy of [Greyhound's] financial resources available to fund such a program on an as needed basis. [Greyhound] shall provide [UTA] evidence of self-insurance in a form approved by [UTA], on an annual basis within 30 days prior to the anniversary date of the Commencement Date.

It is unclear whether Greyhound followed the prescribed steps to self-insure under the section 10(a) of the contract. But it is clear that when UTA requested that Greyhound cover it for the settlement amount, Greyhound declined.

¶12 The Lease Agreement also contained an indemnity provision, set forth in section 11, providing that Greyhound would indemnify UTA for claims arising from Greyhound's negligence in certain cases and that UTA would indemnify Greyhound for acts of UTA's negligence. The pertinent language describing UTA's indemnification of Greyhound is as follows:

> *[UTA] shall indemnify, save harmless and defend [Greyhound],* its agents and employees from and *against all claims*, mechanic liens, damages, actions, costs, charges and other liabilities for property damage or injury or death to persons, including attorney's fees, *arising out of or by reason of [UTA's] negligent or willful acts or omissions* relating to any of its undertakings hereunder. (Emphasis added).

Greyhound also points to language in sections 4, 6, and 12 of the Lease Agreement to establish that UTA had a duty to provide a facility that complied with applicable ordinances and regulations,[3] had no adverse physical or structural conditions,[4] and was properly maintained.[5] The Lease Agreement also contains language concerning attorney fees. Section 32 states, "[i]n the event either Party enforces the terms of this Lease by suit or otherwise, the Party found to be at fault by a court of competent jurisdiction shall pay the cost and expense incurred thereby, including reasonable attorney's fees."

---

[3] Section 4 of the Lease Agreement provides in relevant part, "[UTA] represents to [Greyhound] that the Leased Premises and Common Area will comply with all applicable zoning requirements, ordinances, regulations, and all applicable laws, affecting the Leased Premises and Common Area and/or required in [Greyhound's] use of the Leased Premises and Common Area including the Americans with Disabilities Act (or other laws affecting handicapped access)."

[4] Section 6(e) states, "[UTA] hereby represents to [Greyhound], to the best of [UTA's] knowledge, that as of the Commencement Date . . . there is no adverse fact relating to the physical, mechanical or structural condition of the Leased Premises or any portion thereof which has not been specifically disclosed to [Greyhound]."

[5] Section 12(b) states that, among other maintenance responsibilities, "[UTA] shall maintain and keep in good repair . . . the physical integrity of . . . sidewalks and walkways."

¶13 The parties filed cross-motions for summary judgment. And after a hearing, the district court held (1) that the clear and unequivocal standard does not apply to insurance procurement provisions under Utah law; (2) that the insurance procurement provision in section 10(h) of the Lease Agreement required Greyhound to obtain commercial general liability insurance to protect UTA from claims arising from Greyhound's "use, occupancy, maintenance and operations under the Lease" and included "liabilities and claims caused by UTA's own negligence;" (3) that Ms. Bradley's claim did "arise from" Greyhound's use of the facility under the Lease Agreement; (4) that Greyhound failed to obtain commercial general liability insurance covering UTA for Ms. Bradley's claim; and (5) that this failure was a breach of the Lease Agreement. The district court then granted UTA's motion for summary judgment, denying Greyhound's motion.

¶14 Subsequently, the district court awarded UTA damages that included the $50,000 UTA had paid to Ms. Bradley and ordered Greyhound to satisfy Ms. Bradley's future Medicare liens, if any. The district court also awarded UTA attorney fees and costs pursuant to section 32 of the Lease Agreement in the amount of $48,811.55 in fees and $610 in costs. Greyhound appeals. We have jurisdiction under Utah Code section 78A-3-102(3).

## Standard of Review

¶15 Greyhound presents three issues on appeal. First, Greyhound argues that the district court should have held that the insurance procurement provision was subject to strict construction under Utah law. Second, Greyhound argues the district court erred in holding that Ms. Bradley's claim "arose from [Greyhound's] use occupancy, maintenance and operations" under the Lease Agreement. "An appellate court reviews a [district] court's legal conclusions and ultimate grant or denial of summary judgment for correctness and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."[6]

¶16 Finally, Greyhound argues the district court abused its discretion in awarding UTA attorney fees. "Calculation of reasonable attorney fees is in the sound discretion of the [district] court, and will not be overturned in the absence of a showing of a clear abuse of

---

[6] *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730 (internal quotation marks omitted).

discretion."[7] Also, although "an award of attorney fees must be supported by evidence in the record," the district court "enjoy[s] broad discretion in evaluating evidence to determine what constitutes a reasonable fee."[8]

## Analysis

¶17 Below, we discuss each issue presented by Greyhound in turn. First, we address Greyhound's argument for strict construction of insurance procurement provisions. We conclude that strict construction does not apply to an agreement to provide insurance for another's benefit. We have never held that such an agreement must be strictly construed, and overarching policy considerations weigh in favor of not adopting such a rule. Second, we interpret the Lease Agreement and uphold the district court's conclusion that Ms. Bradley's claim arose out of Greyhound's use of the premises and that the indemnification and insurance procurement provisions can be harmonized. Finally, we uphold the attorney fee award because the district court found the attorney fees reasonable and necessary, and it based this finding on sufficient evidence in the record.

## I. An Agreement to Procure Insurance Is Distinguishable From an Agreement to Indemnify and Is Not Subject to a Strict Construction Rule

¶18 We affirm the district court's holding that a contractual obligation to procure insurance for the benefit of another is not subject to strict construction. Contrary to Greyhound's assertion, we have never required strict construction of such provisions, and important policy considerations support not adopting such a rule. Below, we first review our caselaw, concluding that we have not adopted a rule of strict construction in this context. We then discuss why we decline to adopt such a rule.

### A. We Have Not Adopted a Rule of Strict Construction in the Insurance Procurement Context

¶19 Although the parties highlight tension in Utah caselaw regarding the application of the rule of strict construction to insurance procurement provisions, we now clarify that we have not adopted such a rule. Greyhound points to language in *Freund v. Utah*

---

[7] *2 Ton Plumbing, L.L.C. v. Thorgaard*, 2015 UT 29, ¶ 53, 345 P.3d 675 (internal quotation marks omitted).

[8] *Id.* (internal quotation marks omitted).

*Power & Light Co.*,[9] along with federal caselaw, to support the application of strict construction to agreements to provide insurance for the benefit of another. But UTA points to the rule announced by the Utah Court of Appeals in *Pickhover v. Smith's Management Corp.*[10] and applied in subsequent appeals court cases to argue that strict construction does not apply to insurance procurement provisions. The *Pickhover* court held that "an agreement to provide insurance for another's benefit, while analogous in some respects to an agreement to indemnify another for the consequences of its own negligence, is not subject to the strict construction rule."[11] In *Freund*, we did not directly confront and analyze the issue now before us, and we decline to apply a rule of strict construction based on this case. Instead, we conclude that insurance procurement provisions are distinguishable from indemnity provisions and are not subject to strict construction.

¶20 As a starting point, both parties recognize, "[i]n a long line of cases spanning more than fifty years, we have repeatedly held that an indemnity agreement which purports to make a party respond for the negligence of another should be strictly construed."[12] The rule of strict construction requires that if a party intends to "assume ultimate financial responsibility for negligence of another," then that intention must be "clearly and unequivocally expressed."[13] The main policy rationale for this rule is that transferring liability for one's negligence "would tend to encourage carelessness and would not be salutary either for the person seeking to protect himself or for those whose safety may be hazarded by his conduct."[14]

¶21 We have not adopted a rule of strict construction of insurance procurement provisions. As discussed below, we did not announce a rule of strict construction in *Freund* and the court of appeals, the only Utah court to fully analyze the issue, held that strict construction does not apply to an agreement to provide

---

[9] 793 P.2d 362, 372–73 (Utah 1990).

[10] 771 P.2d 664 (Utah Ct. App. 1989).

[11] *Id.* at 667.

[12] *Freund*, 793 P.2d at 370.

[13] *Id.* (internal quotation marks omitted).

[14] *Union Pac. R.R. Co. v. El Paso Natural Gas Co.*, 408 P.2d 910, 913 (Utah 1965).

insurance for another's benefit.[15] In *Freund*, the Tenth Circuit Court of Appeals certified several questions to this court, including

> whether it is a correct interpretation of Utah law that an agreement to purchase insurance to cover a third party's own negligence is governed by the same rule of construction as an indemnification agreement to indemnify a third party for its own negligence according to the Tenth Circuit's decision in *Kennecott Copper Corp. v. General Motors Corp.*[16]

¶22 *Kennecott Copper* involved a purchase order for the lease of dump trucks between General Motors (the lessor) and Kennecott Copper (the lessee).[17] The purchase order stated that "Kennecott will provide liability and property insurance related to possession and operation of the units."[18] Kennecott purchased insurance, and subsequently one of the trucks sustained extensive damage due to General Motors' negligence.[19] Kennecott and the insurance company paid for the damages and then instituted a claim against General Motors.[20] General Motors argued that it was a beneficiary of the policy and thus immune from the claim.[21] The court held that under Utah law agreements to purchase insurance for another's benefit were strictly construed.[22] The court then concluded that the purchase order language did not clearly and unequivocally require the lessee to purchase design insurance. Therefore, the court reasoned, Kennecott did not owe General Motors insurance for this accident.[23]

¶23 In *Freund*, we briefly discussed the rule announced by the Tenth Circuit in *Kennecott Copper* and the holding in that case. We

---

[15] *Pickhover*, 771 P.2d at 667.

[16] *Freund*, 793 P.2d at 364.

[17] *Kennecott Copper Corp. v. Gen. Motors Corp.*, 730 F.2d 1380, 1381 (10th Cir. 1984).

[18] *Id.* (internal quotation marks omitted).

[19] *Id.*

[20] *Id.*

[21] *Id.* at 1382.

[22] *Id.* at 1382−83.

[23] *Id.* at 1383.

then stated that "[w]e have no quarrel with that result."[24] But we did not apply a rule of strict construction to the insurance procurement provision in *Freund*. Instead, we concluded that because the indemnification provision in the contract at issue clearly and unequivocally covered the other party's negligence, the insurance procurement provision in that contract should be interpreted under traditional rules of contractual interpretation.[25] We also stated that "[a] heightened rule of construction is not warranted" and cited *Pickhover* favorably. And as explained below, *Pickhover* clearly states that a rule of strict construction does not apply to agreements to procure insurance for the benefit of another under Utah law.[26]

¶24 Our decision in *Freund* does not announce a rule of strict construction of agreements to provide insurance for another's benefit. Greyhound argues that our statement that we have "no quarrel" with the result in *Kennecott Copper* endorsed the rule stated therein, requiring strict construction of insurance procurement provisions under Utah law. We decline to read *Freund* in this manner for several reasons. First, we did not directly state support for a rule of strict construction of insurance procurement provisions in *Freund*, but merely stated that "[w]e have no quarrel with that result" when discussing the outcome of *Kennecott Copper*. While this language supports the result of *Kennecott Copper*, it does not adopt the rule of strict construction stated therein.

¶25 Second, in *Freund*, we did not apply a rule of strict construction to the insurance procurement provision. Instead, we concluded that because the indemnification provision clearly covered the indemnitee's negligence, the insurance procurement clause would be "construed as any other contractual language."[27]

---

[24] *Freund*, 793 P.2d at 372 (holding that "a further provision in that agreement to fund that indemnification by purchasing insurance should be construed as any other contract language" when the indemnification provision expressed a clear and unequivocal intent to cover the other party's negligence).

[25] *Id.*

[26] *Id.* at 373; *see Pickhover*, 771 P.2d at 667, 670 (stating that "[t]he Utah cases referred to by the Tenth Circuit in *Kennecott Copper* do not support its conclusion that contracts to provide insurance are subject to the strict construction rule" and later announcing that "the rule [of strict construction] applies only to indemnity provisions").

[27] *Freund*, 793 P.2d at 372.

After applying the rule above, we stated, "[a] heightened rule of construction is not warranted" and cited favorably to *Pickhover*, which clearly states that a rule of strict construction does not apply to insurance procurement provisions.[28]

¶26 Finally, in *Freund* we narrowed the rule of strict construction for indemnification agreements by recognizing the "growing trend to relax some of the strictness of the rule of construction when indemnity arises in a commercial context."[29] We found it appropriate to "evaluat[e] the indemnification agreement according to the objectives of the parties and the surrounding facts and circumstances"—such as whether the parties are sophisticated commercial entities contracting at arm's length.[30] Thus, a close reading of *Freund* shows that we did not state a broad rule of strict construction for insurance procurement provisions that required coverage of another's negligence.

¶27 The only Utah court to fully analyze the issue now before us is the court of appeals in *Pickhover*. There, the court directly addressed the issue and was "convinced that an agreement to provide insurance for another's benefit, while analogous in some respects to an agreement to indemnify another for the consequences of its own negligence, is not subject to the strict construction rule."[31] In that case, the court was construing a contract with an insurance procurement provision, but no indemnification provision. The parties had executed a purchase agreement where the purchaser, Young Electric Sign Company (YESCO), agreed to provide insurance to the purchasee, Marveon.[32] The purchase agreement stated,

> [YESCO] agrees . . . to provide, at its expense, insurance coverage adequate to fully protect [Marveon] against property damage . . . or personal injury or death claims arising out of the ownership, maintenance, use, service, transportations [sic], or

---

[28] *Id.* at 373.

[29] *Id.* at 370.

[30] *Id.*

[31] 771 P.2d at 667.

[32] *Id.* at 665–66.

installation of [signs] in a minimum amount of One Million Dollars ($1,000,000.00).[33]

YESCO failed to provide the insurance.[34] Subsequently, Mr. Pickhover was killed when a sign installed by Marveon fell on him.[35] Mr. Pickhover's estate filed a wrongful death suit against YESCO, Marveon, and additional defendants.[36] It was eventually established that Marveon had negligently installed the sign.[37] The district court ruled that Marveon was entitled to indemnification by YESCO for up to $1 million, the amount specified in the insurance provision.[38]

¶28 The issue presented to the court of appeals was whether the insurance procurement provision of the contract "require[d] YESCO to provide an insurance policy covering the financial consequences of Marveon's own negligence."[39] YESCO argued, as Greyhound does here, that under Utah law an agreement to procure insurance is analogous to an indemnification provision and "therefore, the same standard of strict interpretation is applicable."[40] YESCO went on to argue that the insurance procurement provision failed to meet the strict standard and thus it should not be liable to Marveon when Marveon's negligence caused the injury.[41]

¶29 The court then fully analyzed whether strict construction applies to agreements to procure insurance for the benefit of another under Utah law. The court examined federal caselaw, including the strict construction rule announced in *Kennecott Copper*, and concluded that "*Kennecott Copper* misconstrues Utah law."[42] The court then announced that indemnification and insurance

---

[33] *Id.* at 665−67 (alterations in original) (internal quotation marks omitted).

[34] *Id.* at 666.

[35] *Id.*

[36] *Id.*

[37] *Id.* at 666 n.1.

[38] *Id.* at 666.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at 667.

procurement provisions are distinguishable. It held that strict construction was not warranted in the insurance procurement context.[43] The court found support for this rule from the modern trend of limiting application of strict construction in favor of freedom of contract, in shifting policy considerations, and in supportive caselaw from other jurisdictions.[44] UTA also cites to two additional cases from the court of appeals that apply the rule announced in *Pickhover*.[45]

### B. Agreements to Procure Insurance for Another's Benefit Are Not Subject to Strict Construction Under Utah Law

¶30 Having concluded that *Freund* does not require a broad rule of strict construction, we decline to extend strict construction to insurance procurement provisions because key differences between indemnity and insurance procurement provisions make strict construction less appropriate in the insurance procurement context.

¶31 Strict construction is a limitation on the parties' freedom to contract. Instead of applying traditional rules of construction aimed at determining what the parties intended by the contractual language, the court imposes a requirement that certain language must be used to clearly and unequivocally show the parties' intent. A rule of strict construction could, therefore, hinder a party's ability to freely contract and allocate risk. In general, courts are loath to interfere with parties' ability to contract freely.[46] We have recognized that "[i]t is not [the court's] prerogative to step in and renegotiate the

---

[43] *Id.* at 670.

[44] *Id.* at 667−70.

[45] *See Christiansen v. Holiday Rent-A-Car*, 845 P.2d 1316, 1322 (Utah Ct. App. 1992) ("Applying the principles of *Pickhover* and *Richmond* to the instant facts, we conclude that [the lessee] is liable to the [sublessor] for any amount that [the lessee's insurance company] would have been obligated to pay on behalf of [the lessee] under the terms of the policy which should have been procured by [the lessee].");  *Fashion Place Inv., Ltd. v. Salt Lake Cnty.*, 776 P.2d 941, 944 (Utah Ct. App. 1989) (holding that "[s]ince [the plaintiff] agreed to provide insurance for the benefit of its tenant, Salt Lake County, we hold that the strict construction rule does not apply, but instead, we follow the modern trend and conclude that the lease clearly imposes the responsibility for providing fire insurance on the landlord").

[46] *See Commercial Real Estate Inv., L.C. v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 38, 285 P.3d 1193.

contract of the parties."[47] "Instead, unless enforcement of [the contract] would be unconscionable, we should recognize and honor the right of persons to contract freely and to make real and genuine mistakes when dealings are at arms' length."[48] Further, "[a] contract functions in part to apportion risk of future events between the contracting parties. . . . [and] parties are free to allocate the risk of future events between them however they wish."[49]

¶32 In essence, the bargained-for-exchange in an insurance procurement provision puts the economic burden of obtaining insurance on the procuring party in order to shift the risk to a third-party insurer.[50] As the court of appeals stated, "[a]n agreement to provide insurance merely allocates an economic burden on one party to make a payment to protect another after the parties have ultimately decided to shift the risk of loss . . . upon an insurer."[51] Because a commercial general liability policy, such as the one referenced in the Lease Agreement, typically includes coverage for the named parties' negligence,[52] applying strict construction could undermine the bargained-for-exchange of the parties.

---

[47] *Id.* (internal quotation marks omitted).

[48] *Id.* (internal quotation marks omitted).

[49] *Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 2008 UT 3, ¶ 19, 178 P.3d 886.

[50] *See Pickhover*, 771 P.2d at 668.

[51] *Id.* (second alteration in original) (internal quotation marks omitted).

[52] Black's Law Dictionary defines a "commercial general-liability policy" broadly as "[a] comprehensive policy that covers most commercial risks, liabilities, and causes of loss. This type of policy covers both business losses and situations in which a business is liable to a third party for personal injury or property damage." BLACK'S LAW DICTIONARY 877 (9th ed. 2009). Others have noted that commercial general liability insurance is a "type[] of negligence liability insurance," which generally covers the insured's negligence. Vickie Bajtelsmit & Paul D. Thistle, *The Reasonable Person Negligence Standard and Liability Insurance*, 75 J. RISK & INS. 815, 816 (2008); *see also* James E. Joseph, *Indemnification and Insurance: The Risk Shifting Tools (Part II)*, 80 PA. B. ASS'N.Q. 1, 11 (2009) ("The purpose of commercial general liability insurance is to protect a business against unforeseen third-party liability. Generally, this covers personal injury and property damage caused by the negligence of the insured

(Continued)

¶33 The differences between an insurance procurement provision and indemnity provision make strict construction less appropriate in the insurance provision context. Indemnification typically imposes a broad "duty to make good any loss, damage, or liability incurred by another."[53] This expansive duty, which usually contains no limits or bounds, exposes the indemnitor to potentially enormous liability from the actions of the indemnitee. In contrast, an insurance procurement provision is normally limited in substantive ways. A party obligated to procure commercial general liability insurance assumes much less risk than it would if it was indemnifying the other party for its negligence. The party that agreed to procure insurance need only pay the premium and the insurer then assumes the risk of loss, within the limits of the policy.

¶34 Even in the self-insurance context insurance procurement is distinguishable from indemnity. We recognize that a contract could include a broad self-insurance provision that would be indistinguishable from an indemnity provision, but that is not the contract before us. Here, the contract allows the procuring party to self-insure but the self-insurance is limited in the same way insurance policies are typically limited—with a maximum benefit and limited coverage.[54] Because an agreement to indemnify is broader, potentially exposing the indemnitor to unlimited liability, a rule of strict construction is more appropriate in that setting. But in the narrower context of an insurance procurement provision, where the procuring party's only obligation is to purchase insurance, the need for strict construction is less. This is especially true when

business."); Christina Ross et al., *Limiting Liability in the Greenhouse: Insurance Risk-Management Strategies in the Context of Global Climate Change*, 26A STAN. ENVTL. L.J. 251, 283 (2007) ("The standard Commercial General Liability insurance line (CGL) covers a range of risks that businesses impose on third parties, including negligent conduct and other conduct that poses risks to others' health, life, business operations, or property.").

[53] BLACK'S LAW DICTIONARY 837 (9th ed. 2009) (defining "indemnity").

[54] Section 10 provides that the policy will include "the minimum amount of $1,000,000 per occurrence with a $5,000,000 general aggregate" and provides coverage for "damages for personal injury, bodily injury, including accidental death, and from claims for property damage that may arise from Tenant's use, occupancy, maintenance and operations under this Lease."

viewed in the context of the countervailing policy of limiting judicial interference with the parties' ability to contract freely.

¶35 Because of these distinctions, the policy rationale for strictly construing agreements to indemnify has less applicability to agreements to procure insurance. The main policy support for strict construction of indemnity agreements is that relieving the indemnitee of liability for negligence "would tend to encourage carelessness and would not be salutary either for the person seeking to protect himself or those whose safety may be hazarded by his conduct."[55] This policy does not apply with the same force to insurance procurement provisions.[56] Insurance contracts typically have a deductible, a maximum limit, and a limit on the types of claims covered. Because an insurance policy covering liability is narrower than an indemnity provision, the policy argument we advanced in *Union Pacific Railroad* with respect to indemnity provisions is significantly weaker when applied to insurance procurement provisions.

¶36 Finally, in declining to extend strict construction to insurance procurement provisions, we note the trend under Utah law to limit the scope of the strict construction rule even in the indemnity context. Over the past seventy-five years, we have moderated our construction of indemnity provisions. In 1936, we stated that "[i]t is very doubtful that defendant could relieve itself by contract from its own negligence. Ordinarily such contracts are contrary to public policy."[57] Two decades later, we applied a rule of strict construction to indemnity provisions, rather than deeming them to be void as against public policy.[58] Finally, in 1990, in *Freund*, we favorably noted the "growing trend to relax some of the

---

[55] *Union Pacific R.R.*, 408 P.2d at 913.

[56] *See* James M. Fischer, *The Presence of Insurance and the Legal Allocation of Risk*, 2 CONN. INS. L.J. 1, 6 (1996) ("It is generally conceded today that such loss spreading by insurance is socially beneficial and does not undermine any remaining deterrence or penal aspects of liability law."). *See generally* Gary T. Schwartz, *The Ethics and the Economics of Tort Liability Insurance*, 75 CORNELL L. REV. 313, 313–14 (1990) (analyzing "the relationship between liability insurance and tort law's fairness and deterrence objectives").

[57] *Jankele v. Texas Co.*, 54 P.2d 425, 427 (Utah 1936).

[58] *Walker Bank & Trust Co. v. First Sec. Corp.*, 341 P.2d 944, 947 (Utah 1959).

strictness of the rule of construction when the indemnity arises in a commercial context."[59] We found it appropriate when strictly construing an indemnity provision to consider the "objectives of the parties and the surrounding facts and circumstances"—such as whether the contract was made at arm's length between sophisticated commercial entities.[60] We went on to hold that, while the indemnity provision did not "specifically mention the effect of any negligence," "the broad sweep of the language employed by the parties clearly cover[ed] those instances in which the licensor may be negligent."[61] Our trend to limit the harshness of strict construction of indemnity provisions supports our decision today not to extend strict construction to insurance procurement provisions.

¶37 Because we conclude that strict construction does not apply to the insurance procurement provision in this case, we uphold the district court's determination that Greyhound breached section 10 of the Lease Agreement. While the insurance provision does not mention negligence, it clearly states that "[Greyhound], subject to the self-insurance provisions above, at its own cost and expense, shall secure and maintain . . . the following minimum coverage: . . . Commercial general liability insurance with [UTA] named as an additional insured." The plain language of this provision requires Greyhound either to self-insure or to obtain the specified commercial general liability insurance from a third party. Further, commercial general liability insurance is usually understood to cover the insured's negligence.[62] In refusing to either procure insurance or reimburse UTA for the money UTA paid in the settlement of Ms. Bradley's claim, Greyhound breached the Lease Agreement.

## II. The Indemnification Provision and the Insurance Procurement Provision Can Be Harmonized and Ms. Bradley's Claim Arose Out of Greyhound's Use of the Premises

¶38 Greyhound argues that even if we apply traditional rules of contractual interpretation, rather than strict construction, it did not breach the insurance procurement provision. First, Greyhound argues that if the contract is read to require it to provide insurance for UTA's negligence, other sections of the Lease Agreement become

---

[59] 793 P.2d at 370.

[60] *Id.* (analyzing *Niagara Frontier Transp. Auth. v. Tri-Delta Constr. Corp.*, 487 N.Y.S.2d 428, 430 (1985)).

[61] *Id.* at 371.

[62] *See supra*, note 52.

meaningless. These sections include the provisions that require UTA to indemnify Greyhound for UTA's negligence, follow applicable ordinances, provide a physically sound facility, and maintain the common area. Second, Greyhound argues that because Ms. Bradley's claim did not "arise from [Greyhound's] use, occupancy, maintenance and operations," it was not required to procure insurance, as the insurance procurement provision was not triggered.

¶39  When interpreting a contract "[t]he underlying purpose . . . is to ascertain the intentions of the parties to the contract."[63] To do so, "we look to the plain meaning of the contractual language, and we consider each contract provision . . . in relation to all the others, with a view toward giving effect to all and ignoring none."[64] Below, we first discuss how the indemnification and insurance procurement provisions can be harmonized, even if the procurement provision is read to require insurance that covers UTA's negligence. Next, we discuss why Ms. Bradley's claim arose from Greyhound's use of the leased property and so was covered by the insurance procurement provision.

*A.  The Indemnification Provision and the Insurance Procurement Provision Can Be Harmonized*

¶40 Greyhound argues that the district court's interpretation, requiring it to procure liability insurance for UTA's negligence, "is wrong because it . . . renders meaningless the indemnification provision in Paragraph 11 requiring UTA to indemnify Greyhound for claims arising from UTA's negligen[ce]" and "ultimately relieves UTA of its express obligations in Paragraphs 4, 6, and 12 to provide a safe, compliant, and sound physical premises." In other words, Greyhound argues that if the insurance provision is read to require it to provide insurance to cover UTA's negligence, it would not make sense to also have UTA indemnify Greyhound for the same negligent acts. We see the matter differently.

¶41 The insurance procurement provision in section 10, if read to include negligence, requires Greyhound to procure liability insurance with a minimum coverage limit of $1 million per occurrence, with a $5 million general aggregate. The policy must protect UTA against "claims for damages for personal injury, bodily

---

[63] *Osguthorpe v. Wolf Mountain Resorts, L.C.*, 2013 UT 12, ¶ 10, 332 P.3d 620 (internal quotation marks omitted).

[64] *Id.* (alteration in original) (internal quotation marks omitted).

injury, including accidental death, and from claims for property damage that may arise from [Greyhound's] use, occupancy, maintenance and operations under this Lease," including claims that result from UTA's negligence. Next, in section 11 UTA indemnifies Greyhound against "all claims . . . for property damage or injury or death to persons . . . arising out of or by reason of [UTA's] negligent or willful acts or omissions relating to any of its undertakings hereunder." On first reading, this language does appear to cover precisely the same claims—those claims for property damage, personal injury, or wrongful death that result from UTA's negligence. Greyhound points to this overlap and asks why the indemnity provision is necessary if UTA's negligence will be covered by the insurance provision.

¶42 But if we consider the ways in which an indemnification provision and the insurance procurement provision differ, and the relationship between the parties, the independent utility of both provisions becomes apparent. In the section above, we discussed the distinctions between an insurance procurement provision and an indemnity provision. Typically, the insurance coverage obtained through an insurance procurement agreement is narrower than a general indemnification. For instance, insurance may carry a deductible or have a maximum limit. In this case, the maximum coverage provided, if Greyhound procured the least expensive insurance option, would have been $1 million per occurrence and $5 million in aggregate. Therefore, if a personal injury or wrongful death claim exceeded the limits of the insurance policy, then the parties would have to cover the remaining costs.

¶43 The indemnity provision, by contrast, does not have limits or deductibles and so is much broader. Any amount not covered by insurance would fall under the indemnity provision. By way of illustration, if a single wrongful death claim for $3 million arose out of UTA's negligence, the first $1 million would be covered by the insurance policy and the next $2 million would be covered by the indemnity provision. Thus, UTA would be required to indemnify Greyhound for the $ 2 million in excess of the insurance policy. The indemnity provision, in essence, is a mechanism to allocate the risk that remains beyond the insurance limits.

¶44 Even if Greyhound chose to self-insure under the Lease Agreement, the insurance procurement provision and the indemnity provision can be harmonized. If Greyhound chose to self-insure, then section 10(a) of the Lease Agreement required it to do so under a "lawfully established self-insurance program"; and UTA retained the "right to verify the adequacy of [Greyhound's] financial

resources available to fund such a program on an as needed basis." Section 10(a) also required Greyhound to provide UTA with "evidence of self-insurance in a form approved by [UTA], on an annual basis." This section allowed UTA to take steps to ensure that Greyhound was financially able to cover claims of up to $1 million per occurrence or $5 million general aggregate, the agreed upon minimum insurance coverage amounts. This is distinct from the indemnity provision, which provides no opportunity for UTA to verify Greyhound's financial ability to indemnify. Therefore, the insurance procurement provision, in the self-insurance context, gave UTA more and different rights than the indemnity provision. The insurance procurement provision, with its language allowing UTA to verify Greyhound's financial health, would have provided UTA greater confidence that the most likely claims, those for less than the prescribed insurance limits, would be covered either by Greyhound as a self-insurer or through a third-party insurance company.

¶45 The relationship between the parties also supports this reading of the contract. Since the parties are in a long-term business relationship (the Lease Agreement runs through 2045), it is reasonable to assume that in negotiating the contract the parties would try to reduce direct conflict between them. If Greyhound and UTA are both covered by the same commercial general liability policy, then they would not be adverse parties, at least as related to the third-party who is pursing the claim. Also, if the parties were not on the same insurance policy, it is likely they would each obtain independent insurance policies. These policies may cover similar acts and cause redundant insurance coverage. This would be inefficient and could increase litigation between the parties.

¶46 Greyhound also points to the provisions in the Lease Agreement requiring UTA to provide a facility that meets local regulations and ordinances (in section 4), to deliver a structurally sound facility (in section 6), and to adequately maintain the facility (in section 12). Greyhound argues that if UTA is insured for its own negligence, then it is essentially relieved from the non-negligent performance of these duties. This is not the case. If Greyhound provided insurance and UTA breached a duty detailed in the Lease Agreement, Greyhound could sue UTA for breach and recover any damages that resulted. These damages could include any amount not covered by insurance, such as insurance deductibles, increases in insurance premiums, and attorney fees.

¶47 We also note that Greyhound has another option under the Lease Agreement to deal with UTA's negligent maintenance of the facility. Section 30 of the agreement states that if either party fails to

perform its duties under the lease then the other party "may at its option, after sixty (60) days prior written notice . . . , make performance for the other" and submit a bill for the work performed.

*B. Ms. Bradley's Claim Arose Out of Greyhound's Use of the Premises*

¶48  Having concluded that the provisions of the contract can be harmonized even if read to require Greyhound to insure UTA against its own negligence, we now address whether Ms. Bradley's claim triggered Greyhound's duty to provide insurance. Greyhound argues that the plain language of the contract's insurance procurement provision does not require coverage of Ms. Bradley's claim, because her claim did not "arise from [Greyhound's] use, occupancy, maintenance and operations under this Lease." Instead, it argues, "UTA's negligence was an independent and intervening cause that is wholly independent from Greyhound's activities under the Lease Agreement." Greyhound admits that it was the but-for cause of Ms. Bradley's presence at the Intermodal Hub, but asserts that UTA's negligence is the proximate cause of her injury. In doing so, Greyhound urges us to read tort causation principles into the contract. But we conclude that under the plain language of the Lease Agreement, Ms. Bradley's claim arose from Greyhound's use of the premises.

¶49 Under the plain language of the contract, Ms. Bradley's claim "arose out of" Greyhound's use of the facility. Greyhound uses the facility as a passenger bus terminal.[65] At the time of her injury, Ms. Bradley was on a layover during an interstate bus trip. And she was walking directly outside the facility, in the common area described in the Lease Agreement, when she fell. Therefore, her presence and use of the Intermodal Hub flow directly from Greyhound's use of the facility as a passenger bus terminal.

¶50 Greyhound disagrees, relying heavily on *Union Pacific Railroad v. El Paso Natural Gas Co.*[66] In *Union Pacific*, we interpreted a broad indemnity agreement in which El Paso indemnified Union Pacific for "any and all liability . . . of whatsoever nature" that in any way "ar[ose] because of the existence of [El Paso's] pipeline."[67] The

---

[65] Section 5 of the Lease Agreement states that "[Greyhound] and its affiliates or [Greyhound] carriers shall use the Leased Premises exclusively for the occupancy and operation of an inter-city bus terminal and the handling of passengers," among other related uses.

[66] 408 P.2d 910 (Utah 1965).

[67] *Id.* at 912.

indemnification agreement was the result of the negotiation of an easement by El Paso, over Union Pacific land, to allow El Paso's gas pipeline to run adjacent to Union Pacific's tracks.[68] We held that the personal injury of an El Paso employee, who was struck by a negligently-driven Union Pacific train while on his way to perform maintenance on the pipeline, was not within the scope of the provision.[69] We concluded instead that "damages guaranteed against [in the indemnity provision] should have at least some causal connection with the construction, existence, maintenance or operation of the pipeline other than an incident which happened merely coincidental to its existence."[70]

¶51 *Union Pacific* is clearly distinguishable from the case before us. Ms. Bradley's injury is much more closely related to Greyhound's use of the Intermodal Hub as a passenger bus terminal than the car accident was to El Paso's use of the easement for a gas pipeline. The personal injury in *Union Pacific* was caused by a train colliding with a car carrying an El Paso employee a mile and a half away from the pipeline.[71] We found that a car accident a mile and a half from the pipeline did not have a causal connection to the construction, existence, maintenance, or operation of the pipeline.[72]

¶52 By contrast, in Ms. Bradley's case the causal connection between the object of the insurance procurement provision and the incident is much more closely linked. Here, the object of the insurance procurement provision is the use of the facility by Greyhound, including its use of the facility to handle passengers of its bus service. Ms. Bradley was a passenger of Greyhound's and she was injured while walking in the common area covered by the Lease Agreement. This creates a much stronger causal connection than found in *Union Pacific*. We therefore conclude that *Union Pacific* does not alter our reading of the plain language of the contract at issue here.

¶53 Also, our reading of the plain language is informed by our broad interpretation of similar "arising out of" language in the insurance context. In *National Farmers Union Property & Casualty Co.*

---

[68] *Id.*

[69] *Id.* at 914.

[70] *Id.*

[71] *Id.* at 912.

[72] *Id.* at 914.

*v. Western Casualty & Surety Co.*, we discussed this broad interpretation:

> As used in a liability insurance policy, the words "arising out of" are very broad, general and comprehensive. They are commonly understood to mean originating from, growing out of, or flowing from, and require only that there be some causal relationship between the injury and the risk for which coverage is provided.[73]

Here, there is certainly some causal relationship between Ms. Bradley's injury and Greyhound's use of the Intermodal Hub as a passenger bus terminal. Greyhound has argued that caselaw interpreting insurance contracts should not be applied in this context. We disagree. Both parties were sophisticated and were directly contemplating insurance coverage when they crafted the "arise from" language in section 10(h)(1). Further, if Greyhound had chosen to self-insure, the language in section 10(h)(1) would effectively have been the insurance contract. It is therefore appropriate to look to our caselaw construing insurance policies when interpreting this contract provision.

¶54 Under the plain language of the contract, Ms. Bradley's injury arose from Greyhound's use of the leased premises—she was Greyhound's passenger, on a layover during her Greyhound bus trip, and was injured directly outside Greyhound's bus terminal. Because we conclude that Ms. Bradley's injury arose out of Greyhound's use of the premises, we hold that the Lease Agreement's insurance procurement provision was triggered and Greyhound was thus required to provide insurance covering UTA's negligence.

### III. We Affirm the District Court's Attorney Fee Award

¶55 The final issue presented is whether the district court abused its discretion in awarding UTA its attorney fees. After holding that the insurance procurement provision was not subject to strict construction and the Lease Agreement required Greyhound to purchase commercial general liability insurance that would cover UTA's negligence, the district court held Greyhound to be in breach of the Lease Agreement. Subsequently, the district court awarded UTA damages, including attorney fees as the prevailing party

---

[73] 577 P.2d 961, 963 (Utah 1978) (quoting *Lawver v. Boling*, 238 N.W.2d 514, 518 (Wis. 1976)).

pursuant to section 32 of the Lease Agreement. The court awarded UTA $48,811.55 in fees and $610 in costs. In its appeal, Greyhound argues that the district court abused its discretion in awarding UTA its attorney fees. Specifically, it argues the district court abused its discretion because the court awarded UTA attorney fees for claims for which UTA was not the prevailing party. Greyhound also argues the court did not have an adequate evidentiary basis to conclude that the attorney fees were reasonable. Under these theories, Greyhound challenges $10,503.50 of the $48,811.55 fee award. We conclude that the district court did not abuse its discretion in awarding attorney fees to UTA as the prevailing party and find the district court's decision had an adequate evidentiary basis.

¶56 "In Utah, attorney fees are awardable only if authorized by statute or contract."[74] Here, the parties included a provision in their contract, section 32, that stated, "[i]n the event either Party enforces the terms of this Lease by suit or otherwise, the Party found to be at fault by a court of competent jurisdiction shall pay the cost and expense incurred thereby, including reasonable attorney's fees." Below we discuss both why the district court did not abuse its discretion by determining UTA was the prevailing party, and why there is sufficient evidence in the record to support the district court's attorney fee award.

### A. The District Court Did Not Abuse Its Discretion by Holding That UTA Was the Prevailing Party

¶57 Greyhound argues that, although UTA ultimately prevailed on its breach of contract claim, it did not prevail on all of its motions and causes of action. Greyhound contends that UTA should not have received $10,503.50 of its attorney fee award, because these fees were based on an unsuccessful motion and claim.

¶58 We have recognized both the "need for a flexible and reasoned approach to deciding in particular cases who actually is the 'prevailing party'"[75] and that determining the prevailing party "depends, to a large measure, on the context of each case."[76] Also, we have stated that the district court must base its decision on a number of factors, including "the language of the contract or statute that forms the basis for the attorney fees award, the number of

---

[74] *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 17, 40 P.3d 1119 (internal quotation marks omitted).

[75] *Id.* ¶ 24.

[76] *Id.* ¶ 25.

claims brought by the parties, the importance of each of the claims relative to the entire litigation, and the amounts awarded on each claim."[77] This type of evaluation allows the district court to apply a case-by-case approach to determining the prevailing party and gives the district court the "flexibility to handle circumstances where both, or neither, parties may be considered to have prevailed."[78] We have also stressed that because the identity of the prevailing party "depends, to a large measure, on the context of each case," "the [district] court is in a better position than we are as an appellate court to decide" this question.[79] Thus, we employ an abuse of discretion standard when reviewing a district court's prevailing party determination.[80]

¶59 We conclude that the district court did not abuse its discretion in determining that UTA was the prevailing party and awarding it the entirety of its attorney fees. The district court based its decision on factors we have recognized as appropriate when determining the prevailing party—including the contract language, the importance of the claim won by UTA, and the amount of the judgment awarded in its favor. The language of the contract appears to contemplate one prevailing party when it states that "the Party found to be at fault" shall pay attorney fees. It does not appear from the language of the contract that the parties contemplated a detailed analysis of each motion or claim, but instead a broad decision of which party was "at fault." Further, under a prevailing party analysis the district court correctly notes that UTA prevailed on the underlying claim and received a judgment in the amount of its claim. While the district court recognized that "UTA did not prevail on every Motion it filed," the court deemed UTA the prevailing party, as it had ultimately won the breach of contract claim and obtained a judgment in the full amount sought. Therefore, we uphold the district court's determination that UTA was the prevailing party and its decision to award UTA all of its attorney fees.

---

[77] *Neff v. Neff*, 2011 UT 6, ¶ 70, 247 P.3d 380.

[78] *Id.* (internal quotation marks omitted).

[79] *R.T. Nielson*, 2002 UT 11, ¶ 25.

[80] *See Neff*, 2011 UT 6, ¶ 70.

### B. The District Court Did Not Abuse Its Discretion in Basing Its Attorney Fee Award on the Affidavits and Invoice Submitted by UTA

¶60 Greyhound also claims that the district court abused its discretion when it concluded that UTA had presented sufficient evidence of the reasonableness and necessity of its attorney fees. Greyhound claims that the district court abused its discretion by relying on information that did not include "any evidence to show who those people are [who are named on the invoice], what their qualifications are, or why their hourly rates are appropriate." Greyhound also faulted the district court for relying on billing information that "did not include any foundational evidence regarding the reasonable hourly rates of the eight time keepers." Greyhound further claims that many of the tasks that UTA billed for were unnecessary—including UTA's rule 56(f) motion and its motion for judgment on the pleadings.

¶61 We have long recognized that the district court has "broad discretion in determining what constitutes a reasonable fee, and we will consider this determination [under] an abuse-of-discretion standard."[81] We have also recognized a well-established method for calculating attorney fees. The district court is to consider the following:

1. What legal work was actually performed?
2. How much of the work performed was reasonably necessary to adequately prosecute the matter?
3. Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services?
4. Are there circumstances which require consideration of additional factors, including those listed in the Code of Professional Responsibility?[82]

The district court addressed these factors in its memorandum decision responding to UTA's Motion for Award of Damages and Entry of Final Judgment. In its decision, the district court stated that (1) "the work was actually performed," (2) "the work was reasonably

---

[81] *R.T. Nielson*, 2002 UT 11, ¶ 20 (quoting *Dixie State Bank v. Bracken*, 764 P.2d 985, 991 (Utah 1988)).

[82] *Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 59, 345 P.3d 531 (quoting *Dixie State Bank v. Bracken*, 764 P.2d 985, 990 (Utah 1988)).

necessary to prosecute the matter," and (3) "the billing rates are consistent with rates customarily charged in the community for similar services." The district court did not address any factors listed in the Utah Code of Professional Responsibility.

¶62 Greyhound claims that the district court abused its discretion in coming to these conclusions because it relied on incomplete information. But Greyhound fails to acknowledge the declaration of UTA attorney Scott M. Petersen, which speaks to the reasonableness of the attorney fees. In this declaration, Mr. Petersen states that he has been a litigator for seventeen years and that his hourly rate is reasonable based on his experience, the complexity of the case, and the prevailing hourly rate in Salt Lake City. Mr. Petersen also addresses the qualifications and hourly rates of several attorneys working under him at Fabian & Clendenin. Greyhound is correct in arguing that there is little evidence as to the qualifications for four of the persons on Fabian & Clendenin's invoice. But these individuals combined billed only 4.85 hours out of the total of 194.45 hours billed on the case. While ideally more information would have been provided regarding these billing individuals, this deficiency does not make the district court's decision to award attorney fees an abuse of discretion.

¶63 Greyhound also challenges the district court's decision that "the work was reasonably necessary to prosecute the matter" and points to specific actions that it contends were unnecessary on the part of UTA. The district court found the work was necessary based on a detailed invoice from Fabian & Clendenin. This invoice provided a description of all the work done on the case and the hours required to perform the described task down to the tenth of an hour. It was not an abuse of discretion for the district court to find that the work was necessary.

¶64 As a final matter, we address UTA's request for an award of attorney fees and costs on appeal. We have recognized in the context of statutory attorney fee awards that "when a party is entitled to attorney fees below and prevails on appeal, that party is also entitled to fees reasonably incurred on appeal."[83] We see no reason to deviate from this practice here given that the contract used expansive language in its attorney fee award provision, stating "[i]n the event either Party enforces the terms of the Lease by suit or otherwise, the Party found to be at fault by a court of competent jurisdiction *shall*

---

[83] *Dillon v. S. Mgmt. Corp. Ret. Trust*, 2014 UT 14, ¶ 61, 326 P.3d 656 (internal quotation marks omitted).

*pay the cost and expense incurred thereby*, including reasonable attorney's fees." We remand to the district court to determine the proper attorney fee award for the appeal.

## Conclusion

¶65 We fully affirm the district court's decision on summary judgment. First, we have never strictly construed insurance procurement provisions, and we decline to do so here. Thus, we affirm the district court's holding that traditional principles of contractual interpretation should be used in assessing an agreement to procure insurance. Second, we affirm the district court's holding that under these traditional rules of contractual interpretation, the insurance procurement provision of the Lease Agreement required Greyhound to provide insurance to UTA for liability arising from UTA's own negligent acts; that Greyhound's duty to procure insurance for UTA was triggered in this case; that the various provisions of the Lease Agreement can be harmonized; and therefore, that Greyhound breached the Lease Agreement by failing to procure insurance to cover UTA's negligence. Finally, we uphold the district court's attorney fee award under section 32 of the Lease Agreement because the court did not abuse its discretion by finding UTA the prevailing party and finding the fee reasonable and necessary based on the evidence before it. We conclude that UTA is entitled to attorney fees and costs associated with its appeal and remand to the district court to determine the amount of the award.

———————