**2020 UT App 144**

## THE UTAH COURT OF APPEALS

GREYHOUND LINES, INC.,
Appellant and Cross-appellee,

*v.*

UTAH TRANSIT AUTHORITY,
Appellee and Cross-appellant.

Opinion
No. 20190523-CA
Filed October 22, 2020

Third District Court, Salt Lake Department
The Honorable Royal I. Hansen
No. 140902511

Sarah E. Spencer, Attorney for Appellant and
Cross-appellee

Scott M. Petersen, David N. Kelley, and Sarah C.
Vaughn, Attorneys for Appellee and Cross-appellant

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN FORSTER and DIANA HAGEN
concurred.

HARRIS, Judge:

¶1 Greyhound Lines, Inc. (Greyhound) and Utah Transit Authority (UTA) sued each other, each asserting that the other had breached the terms of a long-term lease agreement (the Lease Agreement). On cross-motions for summary judgment, the district court ruled in favor of UTA. Greyhound appeals that ruling. In a cross-appeal, UTA questions our appellate jurisdiction and, relatedly, seeks reversal of a subsequent order in which the district court construed its first summary judgment order as not fully disposing of UTA's claim for breach of the Lease Agreement. Because we affirm the subsequent order, at least insofar as it determined that the earlier orders did not

completely resolve the case, we conclude that we have jurisdiction to consider Greyhound's appeal. On the merits of that appeal, we reverse the district court's summary judgment order, and remand for further proceedings.

## BACKGROUND

### *The Lease Agreement*

¶2    In 2005, Salt Lake City agreed to lease part of its downtown transport facility (the Intermodal Hub) to Greyhound for use as an interstate passenger bus terminal, and in 2007 UTA assumed all of Salt Lake City's rights and obligations under the Lease Agreement. The parties agreed that the term of the Lease Agreement would be forty years. Under the Lease Agreement, Greyhound agreed to purchase liability insurance that covered UTA against third-party claims, and UTA agreed to assume certain maintenance obligations, including the responsibility for snow removal at the Intermodal Hub.

¶3    Specifically, under a provision captioned "Third Party Liability," Greyhound agreed to "secure and maintain," "at its own cost and expense," a "[c]ommercial general liability insurance" policy "with [UTA] named as an additional insured, in the minimum amount of $1,000,000 per occurrence with a $5,000,000 general aggregate." The Lease Agreement is silent with regard to the permissible size of any deductible associated with the policy. But the agreement does specify that the policy is to cover "liabilities and claims for damages for personal injury, bodily injury," and "property damage that may arise from [Greyhound's] use" of the Intermodal Hub. In a previous case, our supreme court was asked to interpret this provision, and held that it obligated Greyhound to purchase a policy that "covered UTA's negligent acts." *Utah Transit Auth. v. Greyhound Lines, Inc.* (*Greyhound I*), 2015 UT 53, ¶ 6, 355 P.3d 947.

¶4     The parties agreed to split responsibility for maintenance of the Intermodal Hub, with Greyhound generally assuming day-to-day obligations, including keeping the premises "in a clean, sanitary and orderly condition and free of dirt, debris, [and] weeds," and UTA generally assuming longer-term obligations, including "repair and replacement work required . . . by virtue of . . . reasonable wear and tear." However, snow removal obligations were clearly assigned to UTA, with the parties agreeing that UTA "shall be responsible for maintaining and removing snow from" the premises.

¶5     The parties also agreed to indemnify each other under various circumstances. Greyhound agreed to indemnify UTA for, among other things, damage caused to UTA by Greyhound's negligence or breach of the Lease Agreement. For its part, UTA agreed to indemnify Greyhound for damage "arising out of or by reason of [UTA]'s negligent or willful acts or omissions relating to any of its undertakings hereunder."

¶6     In addition, the parties agreed that if, after receiving written notice, either party refused to comply with its contractual obligations, the aggrieved party "may at its option . . . make performance for the other and for such purposes advance such amount as may be necessary," and "[a]ny amount so advanced or expenses incurred . . . shall be immediately due and payable by the defaulting [p]arty."

¶7     Finally, the parties agreed that, "[i]n the event either [p]arty enforces the terms" of the Lease Agreement "by suit or otherwise, the [p]arty found to be at fault by a court of competent jurisdiction shall pay the cost and expense incurred thereby, including reasonable attorney's fees."

*Greyhound I*

¶8     In 2008, a "Greyhound passenger . . . fell from a concrete pedestrian ramp" at the Intermodal Hub. *See Greyhound I*, 2015 UT 53, ¶¶ 4, 8. "UTA admitted negligence in not installing a

handrail on the pedestrian ramp." *Id.* ¶ 4. Claiming injury, the passenger submitted a claim to UTA, which settled the claim by paying the passenger $50,000. *Id.* UTA then asked Greyhound to "reimburse it for the cost of the claim," and Greyhound refused. *Id.* UTA filed suit against Greyhound, alleging that Greyhound had breached the Lease Agreement by failing to procure an insurance policy that would have covered the claim. *Id.* ¶ 3. Greyhound defended the case by asserting that, because the Lease Agreement's insurance provision did not specifically state that the policy had to cover UTA's negligent acts, the provision should be construed strictly so as not to contain any such requirement. *Id.* Our supreme court rejected that argument, declining Greyhound's invitation to construe the provision strictly, and holding that Greyhound's contractual obligation "included the duty to provide insurance that covered UTA's negligent acts." *Id.* ¶ 6; *see also id.* ¶ 37 (stating that "commercial general liability insurance is usually understood to cover the insured's negligence," and holding that, "[i]n refusing to either procure insurance or reimburse UTA for the money UTA paid in the settlement . . . , Greyhound breached the Lease Agreement").

¶9    In reaching that conclusion, the court also rejected Greyhound's argument that the court's interpretation of the Lease Agreement would render superfluous UTA's indemnification and maintenance obligations. *See id.* ¶ 40. The court noted that, when the indemnification provision and the insurance provision are considered together, "the independent utility of both provisions becomes apparent." *Id.* ¶ 42. "Typically, the insurance coverage obtained through an insurance procurement agreement is narrower than a general indemnification," because "insurance may carry a deductible or have a maximum limit," while the "indemnity provision, by contrast, does not have limits or deductibles." *Id.* ¶¶ 42–43. The court stated that "[a]ny amount not covered by insurance would fall under the indemnity provision." *Id.* ¶ 43.

¶10 In a separate paragraph, the court addressed Greyhound's argument that, "if UTA is insured for its own

negligence, then it is essentially relieved from the non-negligent performance of" its contractual maintenance obligations, *id*. ¶ 46, including its obligation to remove snow. The court stated that "[t]his is not the case," explaining that "[i]f Greyhound provided insurance and UTA breached a duty detailed in the Lease Agreement, Greyhound could sue UTA for breach and recover any damages that resulted," including "any amount not covered by insurance, such as *insurance deductibles*, increases in insurance premiums, and attorney fees." *Id.* (emphasis added).

*Greyhound's Insurance Policy*

¶11 In 2010, Greyhound purchased from a third-party insurance carrier (Insurer) a commercial general liability policy (Fronting Policy) covering operations at the Intermodal Hub. Greyhound was the "insured" under the Fronting Policy, and UTA was an "additional insured." The Fronting Policy carried liability limits of $5 million for each occurrence and a $10 million general aggregate. However, the Fronting Policy also carried a $5 million deductible.

¶12 This type of policy is referred to as a "fronting policy," because the insurance carrier is obligated to pay the claim up front, even though it has the right to recover the claim amount back from the insured, in the form of a deductible equivalent to the policy's limit.[1] Greyhound asserts—and UTA does not dispute—that, under the Fronting Policy, it is the responsibility of the insured—and not any additional named insured—to pay the deductible. The policy Greyhound obtained thus obligated Greyhound—and not UTA—to satisfy the deductible. Stated another way, under the Fronting Policy purchased by

---

1. A fronting policy, in its "most common form," is an insurance policy where "an insurer issues a liability policy to a commercial insured with a deductible that equals the policy's liability limits." Douglas R. Richmond, *Getting a Fix on Fronting Policies*, 31 Ins. Litig. Rep. 629, 629 (2009).

Greyhound, Insurer was responsible to defend and indemnify UTA against third-party claims, starting at dollar one, even if those claims were less than the deductible amount, and even if Insurer had the right to recover from Greyhound any amount it paid to defend or indemnify UTA.

¶13    The Fronting Policy was in effect for all of 2013, when the events giving rise to this case transpired.

*The Present Case*

¶14    In January 2013, a patron slipped and fell on snow-covered stairs at the Intermodal Hub. At her deposition, the patron stated that, on the day she fell, there was "a ton of snow" on the stairs, perhaps "five to seven" inches of it, with "a lot of ice underneath that [she could] not see," and it appeared that it had been "days" since the snow and ice had "been cleared." UTA did not dispute these facts during the summary judgment briefing, and there exists no evidence in the record that UTA conducted any snow removal operations in the time period prior to the patron's fall. Alleging injury, the patron submitted a claim to Greyhound. Even though, as described above, it had purchased the Fronting Policy, Greyhound did not submit the claim to Insurer; instead, Greyhound settled the claim by paying the patron $1,000 in exchange for a release of liability for both Greyhound and UTA.

¶15    Greyhound then sued UTA, seeking recovery of the $1,000 it had paid to the patron as damages for UTA's breach of the snow removal and indemnification provisions of the Lease Agreement, and seeking a declaratory judgment that UTA had breached the Lease Agreement by, among other things, failing to remove the snow. UTA counterclaimed, asserting that Greyhound had breached its insurance obligation under the terms of the Lease Agreement, as well as the implied covenant of good faith and fair dealing, by purchasing a policy with a $5 million deductible. In its counterclaim, UTA sought to recover, as damages resulting from Greyhound's breach of contract,

compensation "in an amount to be proven at trial" for the "time, energy, and money" it spent in "receiving and reviewing claims submitted that are related to Greyhound's use of the leased premises." Both sides asked for an award of attorney fees.

¶16 After some discovery, both sides filed cross-motions for summary judgment; each sought complete summary judgment on all claims and counterclaims filed in the case. After full briefing, the district court held oral argument, and after taking the matter under advisement, the court issued a written decision (First Order) granting UTA's motion, at least in large part, and denying Greyhound's. The court explained that, although "[a]t first glance, it appears" that the Fronting Policy "complies with" the Lease Agreement, Greyhound's "procurement of a . . . policy with a $5 million deductible effectively exposes [UTA] to liability for any amount less than $5 million—far short of the *coverage* of $1 million per occurrence contemplated in the Lease Agreement." In summary, the court determined that, because Greyhound "has yet to obtain third-party insurance in accordance with . . . the Lease Agreement, [UTA] is entitled to judgment as a matter of law that [Greyhound] remains in breach of the Lease Agreement," and that Greyhound is "responsible for insuring [UTA] for the damages claimed" by the injured patron. On the basis of that ruling, the court also dismissed Greyhound's claims for breach of contract and declaratory relief "with prejudice and on the merits." The court stated that UTA was entitled to "judgment as a matter of law" on its counterclaims for breach of contract and for declaratory relief, and awarded UTA attorney fees for "having prevailed on" those claims. The court did not discuss the damages aspect of UTA's breach of contract claim, and specifically left open the entirety of UTA's claim for breach of the implied covenant of good faith and fair dealing.

¶17 Greyhound filed an appeal shortly thereafter, which we later dismissed for lack of appellate jurisdiction, because the First Order had not fully disposed of all the claims pending before the court. After the parties realized that the district court

had not summarily disposed of UTA's counterclaim for violation of the implied covenant of good faith and fair dealing, they stipulated to the dismissal of that counterclaim, and the court signed an order (Second Order) dismissing it.

¶18    Neither side filed any immediate appeal following entry of the Second Order. Instead, after several months had elapsed, and after the first appeal was dismissed, Greyhound filed another motion for summary judgment, taking the position that the First Order had not completely disposed of UTA's counterclaim for breach of contract, but instead had been in the nature of a partial summary judgment as to liability. Greyhound pointed out that, in the First Order, the court stated that UTA was "entitled to judgment as a matter of law that [Greyhound] remained in breach of the Lease Agreement" for failing to purchase adequate insurance, and that Greyhound is "responsible for insuring [UTA] for the damages claimed" by the patron, but noted that the court had not considered the question of whether, and to what extent, UTA was entitled to an award of damages on its claim for breach of contract. In its motion, Greyhound asked the court to "enter a final judgment on all claims asserted" in the case and to specifically determine, as a matter of law, that UTA was not entitled to damages relating to Greyhound's breach of contract.

¶19    In response, UTA asserted that Greyhound's motion was filed "years too late," and that the motion was "entirely inappropriate because there [was] nothing remaining on which summary judgment [could] be granted." According to UTA, the First Order had completely resolved its counterclaim for breach of all terms of the contract other than the implied covenant of good faith and fair dealing, and "the judgment became final . . . the moment that the [district c]ourt entered" the Second Order "because each and every cause of action at issue in the lawsuit (both of Greyhound's claims and all three of UTA's counterclaims) had been dealt with." UTA asserted that the fact that the district court "had already awarded fees and costs to UTA as a consequence of Greyhound's breach of contract" was

proof of the First Order's finality and disposition of UTA's counterclaim for breach of contract.

¶20  After full briefing, but without oral argument, the court issued another order (Third Order), in which it interpreted its own First Order narrowly, determining that the First Order had not fully disposed of UTA's counterclaim for breach of contract, because in that order "[t]he Court declined to address" UTA's claim for consequential damages arising from this counterclaim, and that the issue of UTA's entitlement to such damages "remain[ed] unresolved at this juncture." The court then proceeded to address Greyhound's motion on the merits, and determined that UTA had failed to provide evidence of any consequential damages relating to Greyhound's breach of contract. Accordingly, the court entered summary judgment in favor of Greyhound on what it viewed as the last remaining piece of UTA's counterclaim for breach of contract.

ISSUES AND STANDARDS OF REVIEW

¶21  Following entry of the Third Order, Greyhound filed this appeal, raising two issues for our review. First, Greyhound challenges the district court's determination, made on summary judgment in the First Order, that its purchase of the Fronting Policy violated the terms of the Lease Agreement's insurance procurement provision. Second, Greyhound challenges the court's rulings, also on summary judgment in the First Order, regarding its claims against UTA for declaratory judgment and breach of contract related to UTA's snow removal obligations. Summary judgment is appropriate only when "the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). And we "review a district court's legal conclusions and ultimate grant or denial of summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving

party." *Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 14, 423 P.3d 1150 (quotation simplified).

¶22 UTA cross-appeals, and asserts that we lack jurisdiction to reach the merits of Greyhound's appellate arguments because, UTA contends, Greyhound's appeal was not timely filed. UTA argues that the case was over following entry of the Second Order, and that the district court's later determination in the Third Order—that the First Order had not fully disposed of its counterclaim for breach of contract—was incorrect. UTA reasons that any timely appeal by Greyhound would have had to have been filed within thirty days of entry of the Second Order, and that Greyhound's appeal—filed within thirty days of the Third Order—is therefore untimely. "Whether appellate jurisdiction exists is a question of law." *Code v. Utah Dep't of Health*, 2007 UT 43, ¶ 3, 162 P.3d 1097.

¶23 Finally, as they did at the district court level, both sides make claims for attorney fees on appeal. "Whether attorney fees are recoverable is a question of law, which we review for correctness." *Fisher v. Davidhizar*, 2018 UT App 153, ¶ 9, 436 P.3d 123 (quotation simplified); *accord Gardiner v. Anderson*, 2018 UT App 167, ¶ 15, 436 P.3d 237. "[E]ntitlement to attorney fees on appeal is a matter for us to determine in the first instance." *Tronson v. Eagar*, 2019 UT App 212, ¶ 15, 457 P.3d 407.

¶24 Because a challenge to appellate jurisdiction presents "a threshold issue that we must resolve before we may address the appellant's substantive issues," *In re K.F.*, 2009 UT 4, ¶ 21, 201 P.3d 985, we begin by addressing the jurisdictional questions raised by UTA's cross-appeal, *see A.S. v. R.S.*, 2017 UT 77, ¶ 35 n.12, 416 P.3d 465 (stating that "[w]hether a court has jurisdiction to reach the merits of a particular case because of procedural defects . . . is a determination" that an appellate court "should consider at the outset of every case"). After concluding that we have jurisdiction to address the merits of Greyhound's appeal, we proceed to do so, and then conclude by addressing the parties' respective requests for attorney fees.

ANALYSIS

I

¶25 The basis for UTA's jurisdictional challenge is its contention that Greyhound's appeal was not timely filed. "It is axiomatic in this jurisdiction that failure to timely perfect an appeal is a jurisdictional failure requiring dismissal." *Workers Comp. Fund v. Argonaut Ins. Co.*, 2011 UT 61, ¶ 10, 266 P.3d 792 (quotation simplified). Subject to exceptions not pertinent here, a timely appeal is one that is filed "within 30 days after the date of entry" of the final judgment in the underlying case. Utah R. App. P. 4(a). Greyhound filed its notice of appeal within thirty days of the date of entry of the Third Order, which the district court determined was the order that finally resolved all of the claims in the case. If the Third Order was the final judgment in the case, then Greyhound's appeal is timely.

¶26 UTA, however, asserts that the Second Order fully and completely resolved all issues in the case, and that any timely appeal in this case must have been filed within thirty days of the date of entry of the Second Order. UTA maintains that the First Order completely resolved all claims and counterclaims in the case, other than its second counterclaim for breach of the implied covenant of good faith and fair dealing, and that the Second Order then resolved the one unresolved claim. In particular, UTA asserts that its counterclaim for breach of the terms of the Lease Agreement *other than* the implied covenant—its first claim for relief—was fully resolved by the First Order. UTA posits that the Third Order was unnecessary, and it challenges the district court's determination, in the Third Order, that the First Order did not completely resolve its breach of contract claim.

¶27 UTA's argument is not without force. In the First Order, the district court stated that UTA was "entitled to judgment as a matter of law with regard to its first (breach of contract) and third (declaratory judgment) counterclaims," and stated that UTA, "having prevailed on its breach of contract claim," was

"entitled to an award of attorney fees." But while it is possible to interpret this language as completely disposing of UTA's first claim for relief, that is not the only reasonable interpretation, especially when the court's language is read in conjunction with UTA's counterclaim and with other language in the First Order.

¶28 In its counterclaim for breach of contract, UTA asked for damages to compensate it for the "time, energy, and money" it expended in "receiving and reviewing claims submitted that are related to Greyhound's use of the leased premises." And nowhere in the First Order did the district court purport to make any ruling, one way or the other, on any such claim for damages. Moreover, in another place in the First Order, the district court phrased UTA's entitlement to judgment as a matter of law in more limited terms, stating that UTA was "entitled to judgment as a matter of law that [Greyhound] remains in breach of the Lease Agreement." Viewed in this way, it is possible to interpret the First Order as making an order of partial summary judgment—as to breach and liability only, but not as to damages—on UTA's first claim for breach of contract.

¶29 And the district court's award of attorney fees in connection with the First Order does not require the First Order to be interpreted in the manner UTA urges. Without a doubt, UTA was the prevailing party on the motion, and may well have been entitled, under the terms of the Lease Agreement, to an award of attorney fees incurred in litigating the motion. But we disagree with UTA's argument, made here on appeal, that the award of attorney fees made in connection with the First Order was intended to be an award of consequential damages for breach of contract. Under Utah law, attorney fees may sometimes be awarded as a component of a claimant's consequential damages, but generally "only in the limited situation where the defendant's breach of contract foreseeably caused the plaintiff to incur attorney fees through litigation with a third party." *See Collier v. Heinz*, 827 P.2d 982, 983 (Utah Ct. App. 1992). That is not the case here; indeed, the attorney fees declaration UTA submitted in the wake of the First Order made

clear that the fees being claimed were fees incurred in litigating against Greyhound in this case, rather than fees incurred in litigating against third parties in separate cases.

¶30    In this instance, the district court—which composed and signed the First Order—was asked to determine its scope and, after full briefing by the parties, interpreted that order as not having completely resolved UTA's counterclaim for breach of contract. In a situation like this, we afford great deference to a district court's interpretation of its own order and review such an interpretation only for abuse of discretion. *See Uintah Basin Med. Center v. Hardy*, 2008 UT 15, ¶ 9, 179 P.3d 786 ("A court's interpretation of its own order is reviewed for clear abuse of discretion and we afford the district court great deference." (quotation simplified)). Here, we perceive no abuse of discretion in the court's interpretation of its First Order.

¶31    Accordingly, the First Order—as interpreted by the district court, within its discretion—contained only an order of partial summary judgment, as to breach and liability but not as to damages, on UTA's counterclaim for breach of contract. The First Order therefore did not completely resolve that claim, and neither did the Second Order, which spoke only to UTA's second counterclaim for breach of the implied covenant of good faith and fair dealing. As the district court interpreted its own orders, UTA's counterclaim for breach of contract was not completely resolved until the Third Order, and therefore Greyhound's notice of appeal—filed within thirty days of the Third Order—was timely. We have jurisdiction to consider the merits of Greyhound's appeal.

II

¶32    On the merits of that appeal, Greyhound asks us to examine the district court's summary judgment rulings with regard to two separate claims: UTA's counterclaim that Greyhound breached the insurance procurement provision of the Lease Agreement, and Greyhound's affirmative claim that

UTA breached the snow removal provisions of the Lease Agreement. Both sides moved for summary judgment in their respective favor on those claims, and the district court ruled in favor of UTA on both fronts. Greyhound asks us to reverse the district court's entry of summary judgment on these claims in UTA's favor, and to remand with instructions for entry of summary judgment on these claims in its favor. We discuss these two claims, in turn, starting with UTA's counterclaim for breach of the insurance procurement provision.

A

¶33 In its counterclaim for breach of contract, UTA asserted that Greyhound failed to comply with its obligations under the Lease Agreement's insurance procurement provision. It argued that the Fronting Policy Greyhound purchased did not provide coverage for UTA, because it carried a $5 million deductible. The district court agreed, stating that Greyhound's purchase of a "policy with a $5 million deductible effectively exposes [UTA] to liability for any amount less than $5 million—far short of the *coverage* of $1 million per occurrence contemplated in the Lease Agreement." Greyhound challenges that ruling, asserting that the court misunderstood the scope and effect of the Fronting Policy. We agree with Greyhound that the undisputed facts in the record regarding the Fronting Policy lead to the conclusion that Greyhound's purchase of that policy satisfied—rather than violated—the provision of the Lease Agreement that required Greyhound to purchase insurance that protected UTA against third-party negligence claims.

¶34 The question presented is, at root, one of contractual interpretation. The "overriding principle" of contractual interpretation "is that the intentions of the parties are controlling." *Layton City v. Stevenson*, 2014 UT 37, ¶ 21, 337 P.3d 242 (quotation simplified). And the best indication of the parties' intentions is the language they selected to express those intentions. *See Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599 (stating that "we first look to the

plain language within the four corners of the agreement to determine the intentions of the parties"). In reading and evaluating a contract's language, we construe "each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (quotation simplified).

¶35 The Lease Agreement provides that Greyhound must "secure and maintain," "at its own cost and expense," a "[c]ommercial general liability insurance" policy "with [UTA] named as an additional insured, in the minimum amount of $1,000,000 per occurrence with a $5,000,000 general aggregate." The Lease Agreement also states that the policy Greyhound obtains must cover "liabilities and claims for damages for personal injury, bodily injury," and "property damage that may arise from [Greyhound's] use" of the Intermodal Hub. As noted, our supreme court has held that this language requires Greyhound to purchase a policy that covers UTA's negligent acts. *See Greyhound I*, 2015 UT 53, ¶ 6, 355 P.3d 947. Although the Lease Agreement contains specific language regarding the type of policy that must be purchased, as well as the limits of coverage, the Lease Agreement does not contain language discussing the permissible size of any deductible associated with the policy, and does not contain specific language assigning responsibility for paying any deductible.

¶36 However, the Lease Agreement does contain language requiring Greyhound—and not UTA—to cover the "cost[s] and expense[s]" associated with "secur[ing] and maintain[ing]" the policy. And in our view, the "costs and expenses" of any insurance policy include both the policy's premiums as well as its deductibles. Certainly, the phrase "costs and expenses" must include the cost of the policy premium; after all, the premium is literally the cost paid to the insurer for the policy coverage in question. But since the size of an insurance policy's premium bears an inversely proportional relationship to the size of the policy's deductible, *see, e.g.*, *Daniels v. State Farm Mutual Auto.*

*Ins. Co.*, 444 P.3d 582, 588 (Wash. 2019) (stating that "an insured pays a higher premium for a lower deductible"); *Benjamin Moore & Co. v. Aetna Cas. & Surety Co.*, 843 A.2d 1094, 1108 (N.J. 2004) (discussing "the relationship between premiums and deductibles"); *see also* Michael Skolnick, *Considerations in Purchasing and Using Malpractice Insurance*, 18 Utah B.J. 14–15 (Sept.–Oct. 2005) ("Generally speaking, the higher the deductible, the lower the premium."), we think the phrase "costs and expenses" must fairly include the policy's deductible too, especially where, as here, the Lease Agreement does not restrict Greyhound's ability to select the size of the deductible. Indeed, Greyhound appears to share this understanding of the phrase "costs and expenses," stating in its reply brief that, "[a]s long as the insurance obtained by Greyhound meets the minimum liability requirements and Greyhound pays the associated 'costs and expenses,' *such as the deductible and premiums*, the [Fronting P]olicy fulfills Greyhound's insurance procurement obligations under the Lease [Agreement]." (Emphasis added). In our view, that is exactly right.

¶37 Indeed, the undisputed facts in the record about the Fronting Policy's characteristics conclusively demonstrate that the Fronting Policy satisfies all of the other particulars of the Lease Agreement's requirement that Greyhound purchase insurance to protect UTA against third-party negligence claims. The Fronting Policy covers UTA, as an "additional insured," against third-party negligence claims. The Fronting Policy has a limit of $5 million per occurrence and a $10 million general aggregate, which are higher limits than the Lease Agreement requires. Although the Fronting Policy carries a $5 million deductible, the Fronting Policy nevertheless provides valid and helpful coverage to UTA (if not to Greyhound), because Insurer must defend and indemnify UTA against third-party claims starting at dollar one, even though it retains the right to recover the deductible amount back from Greyhound. And as an "additional insured" rather than the "insured," UTA bears no responsibility for reimbursing Insurer for that deductible.

¶38 We appreciate UTA's argument, accepted by the district court, that the $5 million deductible amount makes it appear as though the Fronting Policy provides only illusory coverage to UTA. But in reality, the characteristics of the Fronting Policy do not support this argument. Despite its illusory appearance, the Fronting Policy does provide meaningful coverage to UTA, and satisfies the Lease Agreement's requirement that Greyhound "secure and maintain" insurance to protect UTA, at least so long as the phrase "costs and expenses" is construed to require Greyhound—and not UTA—to pay the rather large deductible. If Greyhound were allowed to use the policy-selection discretion afforded to it under the Lease Agreement to purchase a policy with a relatively low premium but a $5 million deductible, and were then nevertheless allowed to pass the costs of that deductible on to UTA on a per-claim basis, the purchased coverage would indeed be illusory. The Fronting Policy meets the contractual requirements only if the phrase "costs and expenses" is construed to require Greyhound to carry the costs of the large deductible it selected.

¶39 In this case, Greyhound paid the premium and—by satisfying the injured patron with a $1,000 payment—effectively paid the applicable deductible. Accordingly, we conclude that the district court erred by determining, as a matter of law, that Greyhound had failed to satisfy its obligation under the Lease Agreement to provide third-party insurance coverage for UTA. The court's entry of summary judgment in favor of UTA on that point was error; instead, the court should have concluded, on the record before it, that as a matter of law Greyhound *had* complied with the relevant contractual provision.

B

¶40 Greyhound next challenges the district court's dismissal of its own affirmative claims for breach of contract and for declaratory relief, in which it had accused UTA of breaching the Lease Agreement by failing to remove snow. During the summary judgment briefing, Greyhound presented evidence (in

the form of deposition testimony from the patron who slipped and fell) that UTA had failed to remove snow at the Intermodal Hub in January 2013. In response, UTA made no effort to dispute the facts as recited by the injured patron, and offered only a simple denial—unsupported by any evidence, in the form of testimony, affidavits, documents, or otherwise—that it had "failed to provide snow maintenance and removal as required by the Lease Agreement." This is insufficient. *See Orvis v. Johnson*, 2008 UT 2, ¶ 18, 177 P.3d 600 (stating that, once a movant has satisfied its burden "by showing, by reference to the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that no genuine issue of material fact exists, the nonmoving party "may not rest upon the mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial" (quotation simplified)); *Waddoups v. Amalgamated Sugar Co.*, 2002 UT 69, ¶ 31, 54 P.3d 1054 ("The nonmoving party must submit more than just conclusory assertions that an issue of material fact exists to establish a genuine issue."). Instead of attempting to dispute Greyhound's facts with evidence, it merely asserted that the facts recited by the injured patron did "not matter," due to Greyhound's failure to procure insurance that would have covered the claim. The district court agreed with UTA and, after concluding that Greyhound had failed to procure the required insurance, dismissed Greyhound's claims for breach of contract and declaratory relief without further comment. Greyhound now challenges that dismissal, and we find merit in Greyhound's position, at least insofar as concerns Greyhound's claims for nominal damages and declaratory relief.

1

¶41　The apparent basis for the district court's entry of summary judgment in UTA's favor on Greyhound's claims regarding snow removal was its conclusion that Greyhound had breached the insurance procurement provision. As the district court saw it, the slip-and-fall accident should have been covered

by insurance, so it did not matter whether UTA actually removed the snow. We see the issue differently.

¶42 As an initial matter, we have determined that Greyhound did not breach its contractual obligation to provide third-party insurance coverage to UTA. Thus, a decision in favor of UTA on the snow removal claims cannot rest on a subsidiary conclusion that Greyhound failed to procure an insurance policy that protected UTA.

¶43 But more substantively, we agree with Greyhound that the two sets of claims are not inextricably entwined in any event. Regardless of whether Greyhound fulfilled its obligations under the insurance procurement provision, Greyhound's complaints about UTA's snow removal activities must be considered on their merits. It is possible for UTA to breach its snow removal obligations even if Greyhound had failed to procure the required insurance. As discussed more fully below, Greyhound may under some circumstances be foreclosed from seeking certain remedies for UTA's breach of its snow removal obligations, but as Greyhound points out, the question of whether UTA breached those obligations may remain relevant, even in the absence of the availability of certain monetary remedies, to questions like declaratory relief or attorney fees.

¶44 And on the merits of Greyhound's claim that UTA breached its snow removal obligations, UTA offers no substantive defense. Even for the purposes of Greyhound's affirmative motion for summary judgment on its claim for breach of contract, UTA offered only a general unsupported denial, and did not attempt to dispute Greyhound's statement of facts regarding snow removal, including the patron's testimony about the amount and appearance of snow on the stairs at the time of her fall. Greyhound thus conclusively established, for the purposes of summary judgment, that UTA had not satisfied its snow removal obligations. Accordingly, Greyhound was entitled to summary judgment on its claim for declaratory relief that UTA had breached the snow removal provisions of the Lease

Agreement, and was entitled to summary judgment, at least as to liability, on its breach of contract claim. The district court's determination to the contrary was erroneous.

2

¶45   While Greyhound has proven an entitlement to a judicial declaration that UTA breached the snow removal provisions of the Lease Agreement, Greyhound's entitlement to monetary damages as a result of that breach presents an entirely separate question. Certainly, neither party disputes that, had Greyhound hired and paid a third party to remove the snow following UTA's failure to do so, Greyhound would—under the terms of the Lease Agreement—be entitled to an order commanding UTA to reimburse it for those costs.[2] But Greyhound does not contend that it incurred any such costs.

¶46   Instead, Greyhound claims that it is entitled to recover the $1,000 it paid to the patron to settle the claim. UTA resists that claim: as UTA sees it, that payment represents the insurance deductible amount that, pursuant to the insurance procurement provision of the Lease Agreement, is and remains Greyhound's responsibility. We find UTA's argument on this point persuasive, and conclude that Greyhound is not entitled to an award of damages for breach of contract that includes the $1,000 paid to the patron.

---

2. UTA asserts that this reimbursement remedy is the only remedy open to Greyhound under the Lease Agreement. We disagree. The Lease Agreement states that the nonbreaching party "may[,] at its option," choose to hire a third party to perform the work the breaching party should have performed and could, in that instance, pass the costs on to the breaching party. Thus, while Greyhound could have availed itself of that option, the Lease Agreement does not establish that such a remedy was the only one available to Greyhound.

¶47    When we examine a contract, we must read that contract in its entirety and attempt to harmonize all of its provisions, "giving effect to all and ignoring none." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 2009 UT 27, ¶ 25, 207 P.3d 1235 (quotation simplified). As applicable here, these principles require us to read the snow removal provisions in tandem with the insurance procurement provision. As we have already concluded, the insurance procurement provision requires Greyhound to pay all of the "costs and expenses" associated with obtaining insurance that covers UTA against third-party claims; those "costs and expenses" include the premium paid for the policy, as well as the deductible. *See supra* ¶¶ 33–39. Were we to conclude, under circumstances where Greyhound purchased a policy with a $5 million deductible, that Greyhound may recover the deductible amount from UTA as contract damages based on UTA's breach of its snow removal obligations, Greyhound would be in breach of the insurance procurement provision. As explained above, the only way Greyhound's purchase of the Fronting Policy satisfies the insurance procurement provision is if that provision is interpreted to require Greyhound to pay the deductible as part of the "costs and expenses" of the policy. Accordingly, the only way to harmonize the insurance procurement provision with the snow removal provisions is to interpret them, together, as imposing upon Greyhound the obligation to pay any deductible associated with the policy it purchases under the insurance procurement provision, while still allowing Greyhound to pursue declaratory relief or other monetary remedies (e.g., nominal damages, or reimbursement for costs associated with hiring a third party to do UTA's snow removal work).

¶48    Greyhound resists this conclusion by pointing to a passage in our supreme court's opinion in *Greyhound I*, in which the court explained that, "[i]f Greyhound provided insurance and UTA breached a duty detailed in the Lease Agreement, Greyhound could sue UTA for breach and recover any damages that resulted," and that "[t]hese damages could include any amount not covered by insurance, such as insurance deductibles, increases in insurance premiums, and attorney fees." *Greyhound*

*I*, 2015 UT 53, ¶ 46.[3] We disagree with Greyhound's argument, for two reasons.

¶49 First, our supreme court was clear: "if Greyhound provide[s]" compliant insurance under the Lease Agreement, only then may it sue for and "recover any" damages resulting from UTA's breach of contract, including—among other things—insurance deductibles. *Id.* But as it stands, the only way that Greyhound's Fronting Policy satisfies the Lease Agreement's insurance procurement provision is if Greyhound covers the costs and expenses associated with the policy, including the deductible. The premise of the supreme court's

---

3. UTA relies upon *Greyhound I* for a different purpose, asserting that Greyhound's claims are barred, under issue preclusion principles, by the court's holding in that case. But we find that argument unpersuasive. Issue preclusion applies only where, among other things, "the issue decided in the prior adjudication was identical to the one presented in the instant action." *See Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 23, 285 P.3d 1157 (quotation simplified). None of the issues decided in *Greyhound I* are "identical to" the issues being decided here. In *Greyhound I*, the supreme court addressed three issues: "(1) whether under Utah law, an agreement to procure insurance for the benefit of another must be strictly construed; (2) whether the district court erred when it concluded that [an injured person]'s claim triggered Greyhound's duty to procure insurance; and (3) whether the district court abused its discretion in awarding UTA's attorney fees." 2015 UT 53, ¶ 6, 355 P.3d 947. In this case, by contrast, we are asked to determine whether Greyhound breached (or satisfied) the insurance procurement provisions of the Lease Agreement by purchasing the Fronting Policy, and whether UTA breached the snow removal provisions of the Lease Agreement and, if so, what remedies are available to Greyhound for that breach. Because the issues decided in the two cases are not identical, issue preclusion does not apply.

statement—that Greyhound procures compliant insurance—is satisfied here only if Greyhound pays the deductible.

¶50    Second, the statement in *Greyhound I* upon which Greyhound relies is non-binding obiter dicta. "Dicta" is a part of a judicial opinion which is "not critical to the holding." *See State v. Daniels*, 2002 UT 2, ¶ 35, 40 P.3d 611.[4] As our supreme court has explained, "not every statement of law in every opinion is binding," because "where it is clear that a statement is made casually and without analysis, where the statement is uttered in passing without due consideration of the alternatives, or where it is merely a prelude to another legal issue that commands the court's full attention," a statement constitutes dicta, rather than binding precedent. *State v. Robertson*, 2017 UT 27, ¶¶ 25–27, 438 P.3d 491 (quotation simplified). By contrast, binding and precedential statements of law are those made where "it is clear that a majority of the court has focused on the legal issue presented by the case before it and made a deliberate decision to resolve the issue." *Id.* ¶ 27 (quotation simplified). Only when our supreme court "confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion," does that "ruling become[] the law." *Id.* (quotation simplified).

¶51    "Dicta normally comes in two varieties: obiter dicta and judicial dicta," and although "both terms refer to judicial statements that are unnecessary to the resolution of the case," obiter dicta does not bind courts deciding later cases, while judicial dicta does. *Ortega v. Ridgewood Estates LLC*, 2016 UT App 131, ¶ 14 n.4, 379 P.3d 18 (quotation simplified); *see also Exelon Corp. v. Department of Revenue*, 917 N.E.2d 899, 907 (Ill. 2009) (cited in *Ortega*, and stating that obiter dicta "is generally not

---

4. Both parties recognize the supreme court's statement as dicta, with Greyhound specifically acknowledging in its brief that the "statement was arguably not necessary to the Supreme Court's ruling in *Greyhound I*."

binding authority or precedent within the *stare decisis* rule"). "Obiter dicta refers to a remark or expression of opinion that a court uttered as an aside," and includes statements, such as the one at issue here, that were "made by a court for use in argument, illustration, analogy or suggestion." *Ortega*, 2016 UT App 131, ¶ 14 n.4 (quotation simplified); *see also Beaver County v. Home Indem. Co.*, 52 P.2d 435, 444–45 (Utah 1935) ("Obiter dicta is that part of an opinion which does not express any final conclusion on any legal question presented by the case for determination or any conclusion on any prin[c]iple of law which it is necessary to determine as basis for a final conclusion on one or more questions to be decided by the court."). By contrast, judicial dicta is characterized by "statement[s] deliberately made for the guidance of the bench and bar," or those "expression[s] of opinion upon a point in a case argued by counsel and deliberately passed upon by the court." *Ortega*, 2016 UT App 131, ¶ 14 n.4 (quotation simplified).

¶52 The court in *Greyhound I* was presented with an entirely different question than the one that confronts us here. *See supra* note 3. Specifically, the supreme court was not asked to weigh in on the meaning of the "costs and expenses" language in the Lease Agreement's insurance procurement provision, and was not asked to consider whether purchase of a $5 million fronting policy with a $5 million deductible could satisfy Greyhound's obligations under that provision. Instead, the court was asked to consider, among other things, whether that provision required Greyhound to purchase a policy that covered UTA's negligence. So while the *Greyhound I* court mused that certain situations may exist where Greyhound might be able to recover insurance deductibles from UTA in the event that UTA breached the Lease Agreement, the court was not asked to consider whether the scenario presented here would qualify as one of those situations. In making the statement, the court was not engaged in an analysis of the questions presented in this appeal. Moreover, the statement cited by Greyhound was not made as the court determined "an issue germane" to the case's ultimate resolution; it was not a statement made after "a majority of the court"

focused on that particular legal issue; and it was not the issue that commanded "the court's full attention." *See Robertson*, 2017 UT 27, ¶ 27 (quotation simplified). In short, the statement made was not necessary to the decision, and therefore qualifies as dicta. And we think the statement is best classified as obiter dicta, rather than judicial dicta: it was made by way of "illustration, analogy, or suggestion," and was not "deliberately made for the guidance of the bench and bar." *See Ortega*, 2016 UT App 131, ¶ 14 n.4 (quotation simplified). Accordingly, we do not consider that statement binding upon our decision here, and do not view that statement as foreclosing our conclusion that— on the facts of this case, where Greyhound purchased a fronting policy with a $5 million deductible, and where Greyhound's payment of the deductible is the linchpin to its compliance with the insurance procurement provision—Greyhound is obligated to pay the insurance deductible, and cannot recover the deductible from UTA as damages for breach of contract.

¶53   But even though it incurred no actual recoverable damages, Greyhound is in any event entitled to nominal damages for UTA's breach of contract. Nominal damages are "a trivial sum such as one cent or one dollar awarded to a plaintiff whose legal right has been invaded but who has failed to prove any compensatory damages." *Foote v. Clark*, 962 P.2d 52, 57 (Utah 1998) (quotation simplified). Such damages are "a means of acknowledging invaded rights without rewarding a successful party for nonexistent damages," *id.* at 58, and "are recoverable upon a breach of contract if no actual or substantial damages resulted from the breach or if the amount of damages has not been proven," *Smith v. Simas*, 2014 UT App 78, ¶ 26, 324 P.3d 667 (quotation simplified). In this case, Greyhound has proven that UTA breached the contract and, even though it is not able to prove that it sustained any actual recoverable damages, it is nevertheless entitled to nominal damages.

¶54   In sum, then, Greyhound is entitled to entry of summary judgment in its favor on its claim for a declaratory judgment that UTA breached the snow removal provisions. Greyhound is

entitled to summary judgment as to liability (breach) on its claim for breach of contract related to those same provisions, but on that claim is entitled to recover, as damages, only nominal damages, and not any amount that would fairly represent the deductible payment required under the Fronting Policy.

III

¶55　Finally, Greyhound seeks reversal of the district court's award of attorney fees to UTA, and both parties seek an award of attorney fees on appeal. "In Utah, attorney fees are awardable only if authorized by statute or by contract." *Federated Cap. Corp. v. Haner*, 2015 UT App 132, ¶ 11, 351 P.3d 816 (quotation simplified). The Lease Agreement contains an attorney fees provision stating that, "[i]n the event either [p]arty enforces the terms" of the Lease Agreement "by suit or otherwise, the [p]arty found to be at fault by a court of competent jurisdiction shall pay the cost and expense incurred thereby, including reasonable attorney's fees."

¶56　The district court's award of attorney fees to UTA was premised on its determination, here reversed, that UTA was entitled to certain summary judgment rulings in its favor, and that UTA had therefore "prevailed" with regard to the cross-motions for summary judgment that culminated in the First Order (a ruling we construe as at least implicitly determining that Greyhound was "at fault" under the attorney fees provision of the Lease Agreement). Because we reverse the First Order, we also reverse the district court's award of attorney fees associated with that order, and we remand this case to the district court for a reassessment of both parties' competing claims, under the Lease Agreement's attorney fees provision, to attorney fees incurred in this litigation, including attorney fees incurred in this appeal. *See Crank v. Utah Judicial Council*, 2001 UT 8, ¶ 44 n.18, 20 P.3d 307 (stating that, where "[t]he question of entitlement to fees at the [district] court level has not yet been determined, . . . any appropriate award of attorney fees on appeal is dependent upon that determination and should be assessed by the district

court on remand"); *see also Utah Telecomm. Open Infrastructure Agency v. Hogan*, 2013 UT App 8, ¶ 24, 294 P.3d 645 (stating that a party "is entitled to attorney fees on appeal only if [the party] is awarded attorney fees in the [district] court," remanding so that the district court could assess the parties' claims to attorney fees, and specifying that even a party who is deemed "entitled to attorney fees" may nevertheless be subject to having that award adjusted so that the party "does not recover fees attributable to issues on which [it] did not prevail").

CONCLUSION

¶57 We have jurisdiction to consider the merits of Greyhound's appeal because the district court acted within its discretion in interpreting the First Order as not completely resolving UTA's counterclaim for breach of contract. On the merits of that appeal, we conclude that the district court erred by entering summary judgment in favor of UTA on its counterclaim for breach of contract and on Greyhound's claims for breach of contract and declaratory relief. Greyhound is entitled to judgment, as a matter of law, that it complied with its obligations under the Lease Agreement to procure insurance protecting UTA, and that UTA failed to comply with the Lease Agreement's snow removal provisions. However, Greyhound is entitled to only nominal damages and declaratory relief on its breach of contract claim, and is not entitled to recover the costs of the insurance deductible from UTA in this case.

¶58 We therefore affirm the district court's Third Order, at least insofar as it determined that the earlier orders did not completely resolve the case, but reverse the court's First Order, and remand for further proceedings consistent with this opinion.

———————