2022 UT App 10

# THE UTAH COURT OF APPEALS

ALLIXANDRA KARENN BRADSEN,
Appellant,
*v.*
SHELLPOINT MORTGAGE SERVICES AND
SAXON MORTGAGE SERVICES INC.,
Appellees.

Opinion
No. 20200244-CA
Filed January 21, 2022

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 180401536

David D. Jeffs, Attorney for Appellant

Alex B. Leeman, Attorney for Appellee Shellpoint
Mortgage Services

Stephen G. Stoker, Attorney for Appellee Saxon
Mortgage Services Inc.

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1 In 2007, Allixandra Karenn Bradsen refinanced the mortgage on her house by obtaining a loan secured by a trust deed on the property. Two years later, Bradsen stopped making payments on the loan and, for more than a decade, she has worked to forestall its collection and to prevent foreclosure on the property. As part of her efforts, Bradsen filed the present

lawsuit, alleging that Shellpoint Mortgage Services,[1] the entity claiming to currently hold the note and trust deed, does not have standing to foreclose on the property because it does not hold good title. She also alleges that collection on the note and foreclosure on the property are time-barred.

¶2      The district court disagreed with Bradsen. In granting summary judgment in favor of Shellpoint, it concluded that Shellpoint had demonstrated an unbroken chain of title that proved it is the rightful owner of the note and beneficiary of the trust deed. The court also determined that the six-year statute of limitations had not expired because Bradsen restarted the limitations period by acknowledging her debt when she applied for mortgage relief in 2014.

¶3      On appeal, we agree with the district court that Bradsen revived the statute of limitations by acknowledging her debt, but we disagree with the court's analysis relevant to the chain of title. Accordingly, we vacate the district court's award of summary judgment in favor of Shellpoint and remand for further proceedings.

---

1. Shellpoint, a dba for New Residential Mortgage LLC, is a successor in interest to Ditech Financial LLC. Bradsen filed suit against Ditech, but Shellpoint later acquired Ditech's rights and assumed its role in this litigation. As necessary for historical accuracy, we will refer to Ditech and Shellpoint by their actual names. But in describing the roles and positions of the parties in the litigation, we will refer to Ditech as Shellpoint because Shellpoint is Ditech's successor.

## BACKGROUND[2]

### *The Note and Deed of Trust*

¶4      In June 2007, Bradsen received a loan from Sand Canyon Corporation[3] by executing an adjustable rate note. As collateral for the loan, Sand Canyon took a security interest in Bradsen's property as evidenced by a trust deed that identified Sand Canyon as the beneficiary. The next month, Sand Canyon assigned the trust deed to Saxon Mortgage Services Inc. (the 2007 Assignment).

### *Bradsen's Default*

¶5      Because Bradsen stopped making payments on the loan in March 2009, Saxon executed a Notice of Default and Election to Sell and recorded that document at the county recorder's office (the First Notice). In the First Notice, Saxon accelerated all payments due under the note and invoked its option to foreclose on the property under the trust deed. In response, Bradsen filed a lawsuit in federal court attempting to void the note and trust

---

2. "In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 (cleaned up).

3. In 2007, at the time the note and trust deed were executed, Sand Canyon was known as Option One Mortgage Corporation. To avoid confusion, we will refer to Option One as Sand Canyon throughout this opinion.

deed, alleging that the loan had violated the federal Truth in Lending Act (TILA).[4] *See generally* 15 U.S.C. §§ 1601 to 1667f.

*The Purported Assignment to RCS*

¶6 Ultimately, Saxon did not seek to collect on the note or foreclose under the trust deed. Instead, it sent Bradsen a letter in May 2012, informing her that "the servicing of [her] mortgage loan will be transferred from Saxon . . . to Residential Credit Solutions, Inc." (RCS) and that her "new servicer will be [RCS]."

¶7 In July 2013, the trust deed was purportedly assigned to RCS, but the assignment (the 2013 Assignment) listed "Sand Canyon Corporation f/k/a Option One Mortgage Corporation" as the assignor, not Saxon. Sand Canyon was identified on the signature line of the 2013 Assignment and it was signed by its assistant secretary.

*Bradsen's Request for Loan Modification*

¶8 The next year, on January 22, 2014, Bradsen wrote to RCS asking for a loan modification. She explained, "I write this letter regarding my reason for my late payments on my mortgage loan and to request a workout in order to prevent my home from going into default and foreclosure." She identified her "original loan amount" as $258,400 and stated that when she refinanced with Sand Canyon, her loan ballooned "to over $400 thousand." She also identified what she referred to as "[m]y payment" as $2,409.02 per month.

---

4. Bradsen's federal claim was eventually dismissed five years later. *See Moliere v. Option One Mortgage*, No. 2:10-cv-00802-CW, 2015 WL 429968 (D. Utah Feb. 2, 2015). (Bradsen was formerly known as Murielle Moliere.)

¶9 Bradsen further explained that she had filed her federal lawsuit "to see if the loan could be cancelled" due to TILA violations, but that her lawyer had withdrawn from the case and that she was now "appealing to [RCS] for what [she] wanted in the first place, to modify [her] loan to make [her] mortgage payment more affordable." She then stated, "I am willing to dismiss any litigation actions that have been taken in my behalf, but have been afraid to before someone can look at my matter."

¶10 In addition to her letter, Bradsen submitted to RCS a signed Uniform Borrower Assistance Form seeking mortgage relief under the federal government's Making Home Affordable program. In the form, she repeatedly refers to herself as "Borrower" and acknowledged that the purpose of her application was to obtain "mortgage relief" or "mortgage assistance" under her "existing mortgage." She also referred to her outstanding debt as "my loan."

*The Rescission of the 2007 Assignment*

¶11 In September 2017, Sand Canyon executed and recorded a Rescission of Assignment of Deed of Trust (the Rescission). In the Rescission, Sand Canyon stated that it, when known as Option One, "erroneously filed" the 2007 Assignment assigning the trust deed to Saxon.[5] The Rescission further declared that the 2007 Assignment was thereby "withdrawn, canceled and declared of no force or effect, and that the lien on the [Bradsen] property . . . shall in no way be affected by such erroneous instrument."

---

5. In its ruling, the district court identified the rescinded assignment as *the 2013 Assignment*—the one between Sand Canyon and RCS. This appears to be a misstatement as the face of the Rescission makes clear that it purports to rescind *the 2007 Assignment*—the one between Sand Canyon and Saxon.

*The Assignment to Ditech and the Ditech Affidavit*

¶12   In October 2017, RCS purported to assign the trust deed to Ditech Financial LLC.[6] The next month, Ditech executed an Affidavit of Lost Assignment (the Affidavit). In the Affidavit, a representative of Ditech averred that "[t]he original assignment of the Mortgage between Saxon . . . and Ditech . . . has been lost and/or was not recorded."[7] Ditech further asserted that Saxon "is no longer in business and a replacement assignment is therefore unavailable."

¶13   In December 2017, Ditech executed and recorded a Cancellation of Notice of Default. In the cancellation, Ditech cancelled the First Notice that Saxon had recorded in 2009. On the same day, Ditech executed and recorded its own Notice of Default and Election to Sell (the Second Notice). In the Second Notice, Ditech alleged that Bradsen had defaulted on her "monthly payment obligation set forth in the promissory note"; it also accelerated the amount still due under the note and elected to foreclose on Bradsen's property under the trust deed's terms.

---

6. Prior to the October 2017 assignment, RCS purported to assign the trust deed securing Bradsen's note to Federal National Mortgage Association (Fannie Mae). That assignment was executed and recorded in November 2014. Then, in August 2015, Fannie Mae assigned the trust deed back to RCS, and the assignment was recorded the same month.

7. Aside from the Affidavit, there is no evidence in the summary judgment record of an assignment between Saxon and Ditech.

*The Correction*

¶14   In January 2019, Saxon recorded a Corrected and Restated Assignment of Trust Deed (the Correction). In the Correction, Saxon purported to "correct the assignor identified" in the 2013 Assignment, in which Sand Canyon (years after assigning the trust deed to Saxon) purported to assign the trust deed to RCS. Saxon restated the 2013 Assignment as having been between Saxon and RCS.

*The Shellpoint Assignment*

¶15   Ditech filed a Chapter 11 bankruptcy action before formally foreclosing on the property. The trust deed was later assigned to Shellpoint during bankruptcy proceedings.

*Procedural History*

¶16   Before any formal foreclosure proceedings began, Bradsen filed the underlying lawsuit against Shellpoint and Saxon, seeking to enjoin the foreclosure of her property and seeking quiet title of the property in her favor. In November 2018, Shellpoint asserted a counterclaim, alleging that Bradsen was in default of her loan and petitioning the district court for judicial foreclosure and enforcement of the note. Prior to that time, no entity had filed any action to enforce payment on the note or to foreclose on the property.

¶17   Both Bradsen and Shellpoint subsequently moved for summary judgment. In her motion, Bradsen argued that foreclosure on her property was time-barred. Citing Utah Code section 70A-3-118(1), Bradsen asserted that the holder of a note has six years to enforce the note or foreclose under a deed of trust once the holder has accelerated payments due under the note. Because Saxon first accelerated payments under the note on August 20, 2009, Bradsen argued that Shellpoint's attempt to foreclose on her property after August 20, 2015, was unlawful.

Further, Bradsen argued that the trust deed should be extinguished because the note could no longer be enforced and that, as a result, "the court should quiet title in and to [the subject property] as against [Shellpoint and Saxon] or any other person" claiming an interest in the subject property under the trust deed.

¶18    In its cross-motion, Shellpoint sought dismissal of Bradsen's quiet title claim and summary judgment in its favor on its counterclaim for judicial foreclosure. Shellpoint asserted that the chain of recorded documents proved that it was the current assignee and beneficiary of the note and trust deed, "with all rights thereunder." In so asserting, Shellpoint acknowledged that Bradsen had questioned Shellpoint's standing, pointing to a break in the chain of title due to the 2013 Assignment, where Sand Canyon (rather than Saxon) purported to assign the deed to RCS. But Shellpoint argued that any such break was retroactively corrected when Saxon executed the Correction in 2019. Further, in response to Bradsen's statute of limitations argument, Shellpoint claimed that Bradsen's application to modify her loan restarted the statute of limitations in 2014. It also argued, alternatively, that even if the statute of limitations had run on enforcement of the note, the trust deed was still valid, allowing for foreclosure of the property.

¶19    Bradsen responded to Shellpoint's standing argument by asserting that Shellpoint was not entitled to summary judgment because it had not shown, as a matter of law, that "it is the owner of the note and trust deed." Bradsen argued that Saxon could not unilaterally repair the break in the chain of title by filing the Correction, and that because Saxon never assigned its interest to RCS, Saxon continues to own the note and hold the trust deed. Bradsen further argued that the "inherent inconsistencies" among the Correction, the Rescission, and the Affidavit raised genuine issues of material fact as to the ownership of the note and trust deed that precluded summary

judgment in Shellpoint's favor. In reply, Shellpoint asserted that neither the Rescission nor the Affidavit "has any legal effect," but that even if the documents were effective, the chain of title would still lead unbroken to Shellpoint.

¶20    After hearing argument, the district court granted summary judgment in favor of Shellpoint. Regarding Shellpoint's ability to enforce the note and foreclose the trust deed, the court held that Shellpoint "is the rightful owner of the Note and beneficiary of the Trust Deed." The court reasoned that the naming of Sand Canyon as the assignor in the 2013 Assignment (rather than Saxon) was a "clerical error" that Saxon had the authority to correct via the Correction in 2019. And with the "clerical error" fixed, the court concluded that "there is an unbroken chain of assignments that leads to [Shellpoint]." The court also determined that the Rescission did not create an issue of material fact because "even if [it] were effective, the chain of assignment would be unbroken between the original holder of the Note and Trust Deed and [Shellpoint]."[8]

¶21    Regarding the statute of limitations, the district court held that it "was restarted on January 22, 2014, when Bradsen acknowledged her loan and mortgage debt in her signed Uniform Borrower Assistance Form and related letter." "Having resolved this question," the court did not decide whether "the running of the statute of limitations voids the Trust Deed or extinguishe[d] [Shellpoint's] right to foreclose on [the] Trust Deed."

¶22    In an Amended Judgment, the district court entered judgment in favor of Shellpoint, which included attorney fees,

---

8. The district court did not address what effect, if any, the Affidavit, executed by Ditech before the Correction was executed, had on the chain of title.

and ordered the sale of Bradsen's property to satisfy the judgment.

¶23    Bradsen appeals.

ISSUES AND STANDARD OF REVIEW

¶24    Bradsen contends that the district court made two errors in granting summary judgment in favor of Shellpoint. First, Bradsen argues that the statute of limitations applicable to the enforcement of the note and the foreclosure on her property expired on August 20, 2015. Thus, Bradsen argues, the court erred in concluding that because she restarted the six-year statute of limitations when she applied for mortgage relief in 2014, Shellpoint's action was timely filed. Second, Bradsen argues that the court erred in concluding, as a matter of law, that Shellpoint is the holder of the note and the beneficiary of the trust deed and thus has the right to enforce the note and foreclose on her property.

¶25    Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). We review the district court's legal conclusions and its grant of summary judgment on these issues for correctness. *Cochegrus v. Herriman City*, 2020 UT 14, ¶ 14, 462 P.3d 357.

ANALYSIS

I. The Statute of Limitations

¶26    Bradsen first contends that the district court committed reversible error in concluding that Shellpoint's action to collect on the note and to foreclose the trust deed was timely filed.

Specifically, Bradsen argues that the applicable six-year statute of limitations had expired before Shellpoint filed a foreclosure action or completed a trustee's sale and that the court erred in concluding that she restarted the statute of limitations to foreclose on her property when she applied for mortgage relief. According to Bradsen, her letter "submitted to RCS in January 2014 did not restart the statute of limitations because it was not a sufficiently distinct, direct, unqualified, and intentional admission of a present, subsisting debt of [hers] for which she acknowledged she was liable."

¶27 The applicable statute of limitations requires that "an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date." Utah Code Ann. § 70A-3-118(1) (LexisNexis 2020). In August 2009, Saxon issued the First Notice and accelerated all sums due under the note. Given this acceleration, the beneficiary had six years from August 2009 to enforce Bradsen's obligation. *See id.*

¶28 The Utah Code further provides, however, that the statute of limitations may restart if certain events occur. As relevant here, "[a]n action for recovery of a debt may be brought within the applicable statute of limitations from the date: . . . a written acknowledgment of the debt or a promise to pay is made by the debtor." *Id.* § 78B-2-113(1)(b) (2018). The district court determined that this provision applied to this case, concluding that "the statute of limitations was restarted on January 22, 2014, when Bradsen acknowledged her loan and mortgage debt in her signed Uniform Borrower Assistance Form and related letter." Accordingly, the court concluded that Shellpoint's "action to collect on the Note and to foreclose on the Trust Deed, therefore, is timely filed."

¶29 "To restart a statute of limitations, an acknowledgment of a debt must be 'clear, distinct, direct, unqualified, and intentional.'" *Daniels v. Deutsche Bank Nat'l Trust*, 2021 UT App 105, ¶ 32, 500 P.3d 891 (quoting *Wells Fargo Bank, NA v. Temple View Invs.*, 2003 UT App 441, ¶ 9, 82 P.3d 655). Further, "an acknowledgment 'must be more than a hint, a reference, or a discussion of an old debt; it must amount to a clear recognition of the claim and liability as presently existing.'" *Id.* (quoting *Beck v. Dutchman Coal. Mines Co.*, 269 P.2d 867, 870 (Utah 1954)); *see also Beck*, 269 P.2d at 869 ("No set phrase or particular form of language is required; anything that will indicate that the party making the acknowledgment admits that he is still liable on the claim, that he is still bound for its satisfaction, that he is still held for its liquidation and payment, is sufficient to revive the debt or claim . . . ." (cleaned up)). Indeed, our supreme court has instructed that "nothing short of a distinct, direct, unqualified, and intentional admission of a present, subsisting debt on which a party is liable will be sufficient to take the obligation out of the statute and start it running anew." *Salt Lake Transfer Co. v. Shurtliff*, 30 P.2d 733, 736 (Utah 1934) (cleaned up).

¶30 For example, in *Beck*, the Utah Supreme Court determined that a letter contained "a clear and definite acknowledgment that the respondent presently owe[d] the appellant for his services." 269 P.2d at 870. There, the respondent's letter referred to the appellant's "bill for services" and "expressed that he thought $1,000 was all that was due and owing." *Id.* The supreme court concluded that this letter "contain[ed] an acknowledgment of an existing liability independently of the [respondent's] offer . . . to settle the claim for $1,000." *Id.* In contrast, this court reached the opposite conclusion in *Wells Fargo Bank*. In that case, a party had written to the bank and stated that "this may be a good time to resolve the long outstanding matter of liability of [a] . . . promissory note," which had "accruals . . . exceed[ing] $390,000." *Wells Fargo Bank*, 2003 UT App 441, ¶ 8. This court

determined that although this letter "indicates a dispute," it did not "clearly acknowledge[] any existing liability." *Id.* ¶ 10.

¶31    Bradsen acknowledges that her letter "reference[d] or discusse[d] the existing mortgage loan" and "recite[d] the dispute that [she] had relative to the loan," but she argues that her letter was "insufficient to constitute an acknowledgment" because she did not acknowledge "her present liability for the loan, Note, or Trust Deed."[9] It is true that language referring to "'the long outstanding matter of liability,' . . . indicates a dispute regarding whether [a party] was liable to pay the note" but does not constitute an acknowledgment. *Id.* Yet we agree with the district court that Bradsen's letter did more than refer to a dispute and her willingness to "dismiss any litigation actions"; it contained her "acknowledgement of her presently existing

_____

9. Bradsen also argues that because Saxon remained the owner of the note and trust deed, her 2014 letter to RCS was not sent to the actual creditor and could not restart the statute of limitations. Even assuming RCS did not hold the note and trust deed in 2014, Bradsen's argument is unavailing. Relying on *Nilson-Newey & Co. v. Utah Resources International*, 905 P.2d 312 (Utah Ct. App. 1995), Bradsen asserts that "for an acknowledgment to interrupt the time bar, it must be communicated to the creditor." Yet *Nilson-Newey* and the case it relies on, *Weir v. Bauer*, 286 P. 936 (Utah 1930), are not so restrictive. Rather, those cases state that the acknowledgment "must be *communicated to the plaintiff*," *Nilson-Newey*, 905 P.2d at 316, or to "a creditor, or to his agent, or to one authorized to act on the acknowledgment," *Weir*, 286 P. at 945. On the other hand, "acknowledgment to a stranger is insufficient." *Id.* Here, even if the district court ultimately finds that RCS was not the actual holder of the note and beneficiary of the trust deed in 2014, RCS was no stranger. RCS was, at the very least, the undisputed servicer of the loan. Therefore, the principles of *Nilson-Newey* and *Weir* do not assist Bradsen.

mortgage debt." In her letter, Bradsen recognized her late payments on "[her] mortgage loan" and asked for "a loan modification" to lower her payments. She also identified her "original loan amount" as $258,400 and stated that when she refinanced with Sand Canyon, her loan ballooned "to over $400 thousand." Additionally, Bradsen submitted a Uniform Borrower Assistance Form to RCS in which she again referred to "[her] loan," repeatedly referred to herself as "Borrower," and explained that the purpose of her application was to obtain "mortgage relief" or "mortgage assistance" under her "existing mortgage." We further agree with the district court that Bradsen's letter and form are similar to the letter in *Beck* and that they amounted to a "clear, distinct, direct, unqualified, and intentional" acknowledgement of her outstanding debt. *See Daniels*, 2021 UT App 105, ¶ 32 (cleaned up); *see also Beck*, 269 P.2d at 869–70.

¶32 We therefore affirm the district court's determination that Bradsen's 2014 letter restarted the six-year statute of limitations and that Shellpoint's foreclosure action was timely filed.

## II. Shellpoint's Rights in the Note and the Deed

¶33 In concluding that Shellpoint had demonstrated a clear chain of title such that it could enforce Bradsen's note and foreclose on her property, the district court acknowledged a potential break in the chain attributable to the 2013 Assignment in which Sand Canyon—rather than Saxon—purported to assign the trust deed to RCS. But the court concluded that because the 2013 Assignment contained a mere "clerical error," the Correction recorded by Saxon in 2019 retroactively remedied the break. The court also rejected Bradsen's argument that the Rescission, by which Sand Canyon purported to rescind its assignment to Saxon, precluded summary judgment in Shellpoint's favor.

¶34 We begin by briefly describing the relevant documents and the district court's conclusions based on those documents. We then address the court's conclusion that with the Correction, "there is an unbroken chain of assignments that leads to [Shellpoint]." Last, we address the parties' arguments regarding the Rescission and whether the Rescission is an alternate path to remedy the break in the chain of title.

A. The Chain of Title

¶35 Sand Canyon was the original holder of Bradsen's note and related trust deed, but Sand Canyon did not hold the note and deed for long. Within one month of their execution, Sand Canyon transferred the note and assigned its interest in the deed to Saxon.

¶36 Shellpoint contends that Saxon subsequently intended to assign its interest in the note and deed to RCS, but the 2013 Assignment to RCS was executed by and in the name of Sand Canyon.

¶37 More than four years later, in the fall of 2017, several documents were executed relating to the note and trust deed. First, in September 2017, Sand Canyon recorded the Rescission in which it purported to rescind the 2007 Assignment to Saxon. The Rescission declared the 2007 Assignment "of no force or effect." Next, in October 2017, RCS transferred its interest in the note and trust deed to Ditech (now Shellpoint). And finally, in November 2017, Ditech executed the Affidavit, in which it asserted that an assignment of the note from Saxon to Ditech had been lost. At least for purposes of summary judgment, Shellpoint has argued that neither the Rescission nor the Affidavit "has any legal effect."

¶38 Finally, in January 2019, Saxon recorded the Correction in which it purported to adopt Sand Canyon's 2013 Assignment as

its own and to "correct" it. In the Correction, Saxon restated the 2013 Assignment as having been between Saxon and RCS.

¶39 The district court concluded that "there is an unbroken chain of assignments that leads to [Shellpoint]." Specifically, the court concluded that Saxon had "authority to correct the clerical error" in the 2013 Assignment, and with the Correction in place, Shellpoint is the rightful owner of the note and beneficiary of the trust deed. Alternatively, the court concluded that "even if the [R]escission were effective, the chain of assignment would be unbroken." In other words, if the Rescission effectively annulled the 2007 Assignment from Sand Canyon to Saxon, Sand Canyon's 2013 Assignment to RCS was effective, leaving no break in the chain. Bradsen contends that the court was wrong on both counts.

B.      The Effect of the Correction

¶40 In contending that the 2013 Assignment contained "a scrivener's error" that was remedied by the Correction, Shellpoint invokes both Utah statutory and common law. Citing Utah Code section 57-3-106(9), Shellpoint argues that a party may retroactively correct a minor typographical or clerical error in a recorded document by recording a correction. Shellpoint further argues that the relation back doctrine as described by the Utah Supreme Court in *Arnold Industries, Inc. v. Love*, 2002 UT 133, 63 P.3d 721, allows the same. We address each theory in turn.

¶41 First, Utah Code section 57-3-106(9) provides that "[m]inor typographical or clerical errors in a document of record may be corrected by the recording of an affidavit or other appropriate instrument." Utah Code Ann. § 57-3-106(9) (LexisNexis 2020). Although neither the statute nor Utah precedent expressly defines what constitutes a minor typographical or clerical error, our supreme court has rejected

the contention that the omission of a parcel of property from a conveyance was a "minor typographical or clerical error" that could be corrected by the filing of an affidavit or other instrument pursuant to section 57-3-106(9). *See Pioneer Builders Co. of Nevada, Inc. v. K D A Corp.*, 2012 UT 74, ¶ 56, 292 P.3d 672. The court observed that its conclusion was in line with those of courts in other jurisdictions that "have concluded that significant changes in deeds—such as the improper characterization of a grantee, the omission of a grantee, and the conveyance of an incorrect parcel of land—were not minor typographical or clerical errors that could be remedied" by corrective deeds or affidavits.[10] *Id.* ¶ 58. Similarly, this court has concluded that "listing a different but existing company as the beneficiary of a trust deed (as opposed to, say, misspelling the beneficiary's name, or using a shorthand term to refer to it) is no mere scrivener's error that can be corrected" by recording a corrective deed or affidavit "not signed by the misidentified party." *See Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 35 n.4, 474 P.3d 481 (cleaned up).

---

10. In *Spain v. EMC Mortgage Co.*, No. CIV 07-0308-PHX-RCB, 2009 WL 2590100 (D. Ariz. Aug. 20, 2009), one of the cases cited by the supreme court in *Pioneer Builders*, the federal court rejected the availability of a corrective deed to restate a conveyance made to the plaintiff in his capacity as a trust beneficiary as opposed to in his individual capacity. *Id.* at *5. The *Spain* court explained, "Transposing an entire word, especially when those words are spelled quite differently, is not a mere typographical error, despite how plaintiff tries to portray it. A typographical error would be, for example, the difference between the word 'data' and the word 'date.' It is easy to see how in transcription those two words inadvertently could be interposed one for the other. The same is not true, however, of the words 'beneficiary' and 'individually.'" *Id.*

¶42 In light of this precedent, we have no trouble concluding that the error in the 2013 Assignment is not a minor typographical or clerical error that can be corrected by the filing of an affidavit or corrected deed under section 57-3-106(9). The error is far too significant. Shellpoint contends that Saxon was the true assignor, but the 2013 Assignment does not mention Saxon, nor is Saxon a party to the document. Instead, the 2013 Assignment identifies Sand Canyon—a then-existing entity—as the assignor, and the document is executed in the name of Sand Canyon by its corporate representative.[11] This is not a situation where Saxon merely mistyped its own name. It was not even a party to the document. Thus, given the significance of the mistake, the district court erred to the extent it concluded that the naming of Sand Canyon as the assignor rather than Saxon was a minor clerical error that Saxon could unilaterally correct under section 57-3-106(9).

¶43 Second, Shellpoint relies on the doctrine of relation back as an alternative means to retroactively correct the 2013 Assignment. Our supreme court has recognized the doctrine as allowing "a party to a conveyance of real property to correct an erroneous legal description in the original deed by filing a subsequent or 'correction' deed." *Arnold*, 2002 UT 133, ¶ 21 (cleaned up). The doctrine, if properly invoked, allows a corrective deed to "relate[] back to the time of the original conveyance," making it "effective as of the date of the original deed." *Id*. (cleaned up).

---

11. The 2013 Assignment also contains a notary's affirmation that the assistant secretary of Sand Canyon appeared before her and acknowledged its execution. In other words, the face of the document confirms in multiple ways that Sand Canyon, not Saxon, made the assignment.

¶44 Shellpoint appears to suggest that the doctrine permits the retroactive correction of any error in the original assignment. Although the doctrine has been invoked to correct more than just an erroneous legal description, *see, e.g.*, *Chicago Title Ins. Co. v. Accurate Title Searches, Inc.*, 164 A.3d 682, 699 (Conn. 2017) (stating that "a corrective deed . . . may be issued to correct, among other things, the spelling or omission of an intended grantee's name"), Shellpoint has identified no authority to support its contention that Saxon could invoke the doctrine to unilaterally substitute itself as the assignor in place of Sand Canyon. Not only are we unaware of a case where the doctrine has been invoked to substitute the named assignor, but in *Arnold*, our supreme court stated that for a corrective deed to be effective, it "must be executed by the same grantor that executed the original . . . deed." *Arnold*, 2002 UT 133, ¶ 23 (concluding that a corrective deed was effective only because it was executed by the same partnership that signed the original deed, even though the property was not owned by the partnership but was owned by the individual partners).

¶45 Here, Saxon—not Sand Canyon—executed the Correction. Thus, the Correction is ineffective because it was not executed by the entity that executed the 2013 Assignment. *See id.* Shellpoint attempts to avoid this result by arguing that Saxon was the "actual assignor" because only Saxon held rights in the note and the trust deed at the time the 2013 Assignment was executed. But this fact is the *problem*, not the *solution*. It may be true that Saxon held all rights in the note and the trust deed at the time of the 2013 Assignment, but that fact does not transform Saxon into the executor of the 2013 Assignment. As explained above, Sand Canyon executed the 2013 Assignment by identifying itself as the signatory and by having its agent execute the document on its behalf. Thus, Saxon had no right to correct the 2013 Assignment under the relation back doctrine, and to the extent the district court concluded otherwise, it erred.

C. The Effect of the Rescission

¶46    In granting summary judgment to Shellpoint, the district court relied primarily on the effectiveness of the Correction. But having determined that the Correction was ineffective, we must consider the court's conclusion that the Rescission provides an alternative path to remedy the break in the chain of title. Specifically, the court concluded that "if the [R]escission were effective, the chain of assignment would be unbroken between the original holder of the Note and Trust Deed and [Shellpoint]."

¶47    We share the district court's view that *if* the Rescission operates retroactively to void the 2007 Assignment, the chain of title would be unbroken between Sand Canyon and Shellpoint. After all, if the Rescission had such retroactive effect, it would eliminate the 2007 Assignment from Sand Canyon to Saxon. Thus, Sand Canyon would have held rights to the note and the trust deed at the time the 2013 Assignment was executed, meaning that the assignment from Sand Canyon to RCS was effective and any break in the chain of title would be eliminated.

¶48    But we cannot affirm summary judgment to Shellpoint on this basis because Shellpoint has yet to prove that the Rescission operated to retroactively void the 2007 Assignment. The arguments Shellpoint made to the district court relative to the Rescission were all conditional. In moving for summary judgment, Shellpoint relied entirely on its argument that the Correction remedied the alleged error in the 2013 Assignment. Shellpoint acknowledged the Rescission only in response to Bradsen's argument that the Rescission impaired the effectiveness of the Correction. And in doing so, Shellpoint first "[d]isputed that the [Rescission] has any legal effect," but then asserted that "[e]ven if this document was effective, the chain of title would show an unbroken chain of assignments to [Shellpoint]." Likewise, on appeal, Shellpoint argues that "*if*" the Rescission were effective, "the chain of assignments leads to . . .

Shellpoint," but in making that assertion it again appears to dispute the legal effectiveness of the Rescission, referring to it as an "erroneous attempted rescission." (Emphasis added.)

¶49 In line with Shellpoint's arguments, the district court did not conclude that the Rescission was effective. Instead, it concluded that only *if* the Rescission were effective would the chain of title be intact. And because Shellpoint has disputed, at least for purposes of summary judgment, the legal effectiveness of the Rescission, we are not in a position to affirm the court's summary judgment on that basis.

¶50 In sum, on the question of Shellpoint's claim that it is the rightful owner of the note and beneficiary of the trust deed, we reverse the district court and vacate its summary judgment to Shellpoint based on our conclusion that the court erred in determining that Saxon unilaterally remedied the break in the chain of title by recording the Correction. Because the court's dismissal of Bradsen's quiet title claim was "grounded on this issue," we also vacate the dismissal of that claim without expressing any view on its merits.

¶51 In vacating the court's summary judgment order on the chain of title question, we express no opinion on whether the Rescission is legally effective. Further, we express no opinion on whether Shellpoint can establish its alleged rights under the note and trust deed in some other way. We conclude only that, as a matter of law, the Correction cannot assist Shellpoint in proving its claim that the chain of title is intact and that it is the rightful owner of the note and beneficiary of the trust deed.

### III. The Parties' Attorney Fees Requests

¶52 Both parties request attorney fees on appeal based on provisions in the note and trust deed. Paragraph 7(D) of the note states: "[T]he Note Holder will have the right to be paid back by

[the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law . . . . Those expenses include, for example, reasonable attorneys' fees." Paragraph 21 of the trust deed states that in the event of foreclosure, the "Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees."

¶53    Even assuming both of these provisions have application here, we deny both parties' requests for fees at this time. We deny Shellpoint's request because it has not yet established that it has rights under the note or the trust deed. Thus, it has not shown that it is entitled to recover fees under the cited provisions. But if, on remand, Shellpoint does establish its rights under the note and trust deed and if the district court again determines that Shellpoint is entitled to attorney fees, then the court may also consider whether it would be appropriate for Shellpoint to recover the fees it incurred in this appeal, given its success on the statute of limitations issue. *See Greyhound Lines, Inc. v. Utah Transit Auth.*, 2020 UT App 144, ¶ 56, 477 P.3d 472 (remanding the case to the district court "for a reassessment of both parties' competing claims . . . to attorney fees," including "fees incurred in this appeal," when the appellate court had reversed summary judgment); *cf. Fuja v. Adams*, 2021 UT App 55, ¶ 22 n.9, 492 P.3d 793 (allowing, under the facts of that case, for the possibility that if the appellants prevail on an attorney fees request on remand, they might "as part of that request recover the attorney fees they incurred in this successful appeal"). Likewise, if on remand Bradsen prevails on her now-reinstated claim for quiet title, then the court may consider whether it would be appropriate for Bradsen to recover the fees she incurred in this appeal, given her success in winning a vacatur of the order dismissing her claim. *See Greyhound*, 2020 UT App 144, ¶ 56.

## CONCLUSION

¶54 We affirm the district court's determination that Shellpoint's foreclosure action was not time-barred. But we reverse its determination that Shellpoint's chain of title was intact based on the Correction, and on that basis we vacate the court's order dismissing Bradsen's quiet title claim and granting judgment in favor of Shellpoint on its counterclaim. Accordingly, we affirm in part, reverse in part, vacate in part, and remand for further proceedings.

———————